960 P.2d 927 (1998)
136 Wash.2d 103
STATE of Washington, Respondent,
v.
Debra M. FERRIER, Petitioner.
No. 64930-8.
Supreme Court of Washington, En Banc.
Argued September 18, 1997.
Decided August 27, 1998.
*928 John Jensen, Tacoma, for Petitioner.
Russell Hauge, Kitsap County Prosecutor, Pamela B. Loginsky, Deputy Kitsap County Prosecutor, Port Orchard, for Respondent.
ALEXANDER, Justice.
We granted Debra Ferrier's petition to review a Court of Appeals' decision affirming her conviction for manufacture of a controlled substance. At issue is the validity of a warrantless search of Ferrier's home by officers of the Bremerton Police Department. One of Ferrier's contentions is that the so-called "knock and talk" procedure employed by the police officers to obtain her consent to the search is violative of both the state and federal constitutions. She asserts, additionally, that she did not voluntarily consent to the search that was conducted by the police officers. We conclude that because Ferrier had heightened privacy rights in her home, as guaranteed by article I, section 7 of our state constitution, she should have been informed that she need not consent to the search. Because she was not, the search was unconstitutional and the evidence obtained as a result should not have been admitted into evidence. We, therefore, reverse her conviction.
On April 19, 1993, two officers of the Bremerton Police Department received information from Ferrier's son, who was then in detention at the Youth Services Center in Port Orchard, that his mother was conducting a marijuana grow operation at her house in Bremerton. Because Ferrier's son had no record as an informant, the officers were unable to make any judgment about his credibility. They did, however, drive by the residence that was located at the address given to them by the youth and confirmed that a house matching the description given to them was at that location.
Possessed only with the information Ferrier's son had provided to them and knowledge of the location of Ferrier's home, the officers met with two other Bremerton police officers at a "covert police department location" to discuss a procedure whereby they could gain entry to the home. Verbatim Report of Proceedings (VRP) (vol.II) at 151. At this meeting they hatched a plan to conduct a "knock and talk" because they believed that they could not obtain a search warrant without disclosing "the name of the informant, and we could do a knock and talk without doing that." VRP (vol.I) at 40.
According to one of the police officers who testified at a suppression hearing, a knock and talk is a procedure
like any other follow-up investigation that a detective or police officer would do. You go to the door, knock on the door, make contact with the resident, ask if you can come in to talk about whatever the complaint happens to be, which in this case there's a complaint of a marijuana grow.
Once you're inside, you talk about why you're there and you ask for permission to search the premises.
VRP (vol.I) at 24. The officer also testified that police officers have a high rate of success in getting home dwellers to consent to a search during a knock and talk. He indicated that "[v]irtually everybody allows you in.... I would say about half of them [knock and talks] were successful in terms of the fact that we found evidence of a crime." VRP (vol.I) at 26.
At the conclusion of the meeting, the four police officers proceeded to Ferrier's residence. They were all armed and each wore a black "raid jacket[]" which had the word "police" emblazoned in yellow letters across the front and back. VRP (vol.I) at 28. Upon arriving at Ferrier's residence, two of the officers went to the back of the house in order to "secure the premises." VRP (vol.I) at 45-46. The others proceeded to the front entrance.
The officers who initially went to the front door of Ferrier's home later testified at the *929 suppression hearing that Ferrier opened the door in response to their knock. They said that they immediately identified themselves to Ferrier as police officers, whereupon she invited them into her house. Upon entering the front room of Ferrier's home, the officers noticed that there were two infant children in the room. According to both officers, they then radioed the officers at the rear of the home who responded by entering the dwelling. Upon their entry into the home, the 15-by 15-foot front room contained Ferrier, her two infant grandchildren and the four Bremerton police officers.
According to all three officers who testified at the suppression hearing, Ferrier was told by them that they had information that a marijuana grow operation was being conducted in the house, and that they wanted to search the home and seize the marijuana. All of these officers indicated that Ferrier was then asked to consent to a search and that they went over a "consent to search" form with her before she signed it. The form did not indicate that she had the right to refuse consent to the search. The officers conceded that Ferrier was not told by them that she had the right to refuse to consent to a search nor was she informed of any other rights. According to these officers, the consent form was signed by Ferrier within six or seven minutes after their entry into the home.
Ferrier, according to two of the officers, eventually led them upstairs to a locked door, which she unlocked after retrieving a key. The officers then entered the previously locked room and proceeded to search it. One officer testified that Ferrier was crying during the time the police officers were searching the room. Another officer indicated that Ferrier appeared frightened and nervous throughout the entire time they were at the premises.
Ferrier's testimony about the events leading to the search of her home varied in several respects from that of the police officers. She testified that when the officers were at her front door they said they wanted to talk to her about her son, and that they then "stepped into the house while they said that." VRP (vol.II) at 288. She also stated that "I was terrified. I was scared. They [the police officers] told me they were going to take my grandchildren to Child Protective Services." VRP (vol.II) at 261. Ferrier indicated that she only signed the consent to search form "[b]ecause I didn't want them to take my grandchildren away." VRP (vol.II) at 264. Ferrier confirmed that the police officers did not tell her that she could refuse to consent to a search nor did they inform her of any other rights.
The search of the upstairs room resulted in the seizure of 29 mature marijuana plants, 39 starter plants, and other evidence of a marijuana grow operation. The police officers also seized $2,120 in cash from Ferrier's purse. Ferrier was thereafter charged in Kitsap County Superior Court with manufacturing a controlled substance.[1]
Ferrier moved, pursuant to CrR 3.6(a), to suppress all of the evidence obtained as a result of the search of her home. Following a suppression hearing, the trial court denied her motion and entered findings of fact generally consistent with the State's version of the events leading to the seizure of the marijuana and other evidence. Ferrier and the State then entered into a stipulation as to the facts and submitted them to the trial court which, following Ferrier's waiver of a jury trial, found Ferrier guilty of the charged crime. Ferrier appealed the conviction to the Court of Appeals which affirmed. State v. Ferrier, No. 19280-2-II, slip. op. (Wash.Ct.App. Nov. 27, 1996). This court thereafter granted Ferrier's petition for review.[2]

I.
Ferrier contends that the knock and talk procedure, as employed here, is violative of her rights under the Fourth Amendment *930 to the United States Constitution.[3] Thus, she argues, the consent to search given by her is vitiated. Because she cites no authority for her argument that her federal constitutional rights were violated, we are not obliged to consider the contention.[4]See State v. Lord, 117 Wash.2d 829, 853, 822 P.2d 177 (1991). In any case, the failure of the police to warn an individual of their right to refuse to consent to a warrantless search has previously been found to be merely a factor, and not necessarily dispositive, in assessing the voluntariness of the consent under a Fourth Amendment analysis. State v. Shoemaker, 85 Wash.2d 207, 212, 533 P.2d 123 (1975) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); United States v. Heimforth, 493 F.2d 970 (9th Cir.1974)).

II.
Ferrier's principal contention is that the knock and talk procedure as employed here violated her right to privacy granted by article I, section 7 of Washington's Constitution and thus invalidated the consent she gave to the officers to search her home. Because Ferrier engages in the independent analysis required by State v. Gunwall, 106 Wash.2d 54, 61-62, 720 P.2d 808, 76 A.L.R.4th 517 (1986), we can consider her claim under our state constitution. State v. Wethered, 110 Wash.2d 466, 472-73, 755 P.2d 797 (1988).
Article I, section 7 of our state's constitution provides that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." This provision differs from the Fourth Amendment in that "[u]nlike the Fourth Amendment, Const. art. 1, § 7 `clearly recognizes an individual's right to privacy with no express limitations.'" State v. Young, 123 Wash.2d 173, 180, 867 P.2d 593 (1994) (emphasis added) (quoting State v. Simpson, 95 Wash.2d 170, 178, 622 P.2d 1199 (1980)).
Nevertheless, in order to determine whether article I, section 7 provides greater protection for Ferrier's privacy interests under the present facts, we must apply the six nonexclusive criteria that were first identified in Gunwall, 106 Wash.2d at 58, 720 P.2d 808. Because this court is examining the same constitutional provision that was at issue in Gunwall, we merely adopt the analysis of factors one, two, three, and five that we undertook there.[5]See State v. Boland, 115 Wash.2d 571, 576, 800 P.2d 1112 (1990). Thus, we need examine only factors four and six to decide whether the knock and talk procedure, as employed here, ran afoul of Ferrier's state constitutional right to privacy. Even this examination need not be exhaustive because "[o]ur analysis of art. I, § 7 of the Washington Constitution begins with the proposition that warrantless searches are unreasonable per se." State v. Hendrickson, 129 Wash.2d 61, 70, 917 P.2d 563 (1996). While "consent" to a warrantless search is one of the "narrow exceptions" to the warrant requirement "[t]he burden rests with the State to prove" its presence. Hendrickson, 129 Wash.2d at 71, 917 P.2d 563. This is no easy task because "[t]he exceptions to the requirement of a warrant, including consent, are `"jealously and carefully drawn."'" Hendrickson, 129 Wash.2d at 72, 917 P.2d 563 (quoting State v. Bradley, 105 Wash.2d 898, 902, 719 P.2d 546 (1986) (citing Coolidge v. New Hampshire, 403 U.S. 443, 454, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971))).
We look first to the fourth Gunwall factor, preexisting state law, Gunwall, 106 Wash.2d at 61-62, 720 P.2d 808, in order to determine the degree of privacy protection *931 that Washington has historically afforded to individuals in similar situations. Numerous cases from this court have indicated that article I, section 7 goes further than the Fourth Amendment in protecting "against warrantless searches and seizures, with no express limitations" to this protection. City of Seattle v. Mesiani, 110 Wash.2d 454, 456, 755 P.2d 775 (1988) (citing Simpson, 95 Wash.2d at 178, 622 P.2d 1199); see, e.g., Young, 123 Wash.2d at 188, 867 P.2d 593 (prohibiting warrantless infrared surveillance of home); Boland, 115 Wash.2d at 578, 800 P.2d 1112 (prohibiting warrantless search of curbside trash); Gunwall, 106 Wash.2d at 63, 720 P.2d 808 (prohibiting the warrantless obtaining of phone records or installation of a pen register); State v. Chrisman, 100 Wash.2d 814, 818, 676 P.2d 419 (1984) (finding article I, section 7 violation in warrantless intrusion into student's dormitory room). Especially evident is the fact that "[i]n no area is a citizen more entitled to his privacy than in his or her home. For this reason, `the closer officers come to intrusion into a dwelling, the greater the constitutional protection.'" Young, 123 Wash.2d at 185, 867 P.2d 593 (citation omitted) (quoting Chrisman, 100 Wash.2d at 820, 676 P.2d 419).[6]
In addition, our state Legislature has long provided protection against unlawful government intrusions into the home, making it a gross misdemeanor "for any policeman or other peace officer to enter and search any private dwelling house or place of residence without the authority of a search warrant issued upon a complaint as by law provided." RCW 10.79.040.
We find that preexisting state law, the fourth Gunwall factor, amply supports independent review of this case under article I, section 7. We, therefore, next look to the sixth Gunwall factor, which requires us to examine whether the privacy interest at issue is a matter of particular state or local concern. Gunwall, 106 Wash.2d at 62, 720 P.2d 808. Because of some overlap, the discussion under the fourth factor also applies here. See Gunwall, 106 Wash.2d at 67, 720 P.2d 808.
Ferrier correctly cites Young for the proposition that the degree of privacy a Washington citizen has in the home is primarily a local concern, and that there is no need for national uniformity on this issue. Indeed, her argument that the privacy right at issue is local in nature finds support in this court's willingness, in other contexts, to forsake national uniformity by refusing to abandon our state's well-established protections against "unreasonable governmental intrusions." State v. Jackson, 102 Wash.2d 432, 443, 688 P.2d 136 (1984).
However, the State cites two cases in arguing that "Washington courts that have considered whether a different standard of consent applies under Const. art. I, § 7, have rejected this contention." Supplemental Br. of Resp't at 13 (citing State v. McCrorey, 70 Wash.App. 103, 108 n. 3, 851 P.2d 1234, review denied, 122 Wash.2d 1013, 863 P.2d 73 (1993); State v. Williamson, 42 Wash.App. 208, 213, 710 P.2d 205 (1985), review denied, 105 Wash.2d 1012 (1986)).
Both of these cases are distinguishable from the present, and not just because they predate our holding in Young concerning the protections afforded the home dweller.[7] To guide it in reaching its decision, Division One in McCrorey found only "precedent construing federal authority and not our own state constitution." McCrorey, 70 Wash.App. at 110, 851 P.2d 1234. Because we had not yet spoken on whether a separate state constitutional analysis for voluntary consent applied under article I, section 7, Division One concluded that we were in lockstep with the federal rule on this issue. Williamson dealt *932 with the standard of consent to search under the Fourth Amendment; in fact, that opinion did not even refer to article I, section 7. Thus the State's citation to Williamson in support of its argument is inexplicable. Furthermore, even where we have previously conducted only a Fourth Amendment analysis, we have found that one of three identified factors used in determining the "voluntariness of a consent to search" is "whether the consenting person had been advised of his right not to consent." Shoemaker, 85 Wash.2d at 212, 533 P.2d 123.
Moreover, the State's response ignores the crux of Ferrier's challenge to the constitutionality of the procedure employed here. Ferrier does not argue that the voluntary standard of consent is unconstitutional under article I, section 7. The core of her argument is that the police here violated her expectation of privacy in her home because they conducted the knock and talk in order to search her home, thereby avoiding the general requirement that a search warrant be obtained. Indeed, Ferrier argues that the violation of her privacy right was one of the factors that made her eventual consent involuntary. This right is clearly an interest of local concern under the sixth Gunwall factor due to "[t]he heightened protection afforded state citizens against unlawful intrusion into private dwellings [that] places an onerous burden upon the government to show a compelling need to act outside of our warrant requirement." Chrisman, 100 Wash.2d at 822, 676 P.2d 419 (emphasis added).
Having satisfied the need for an independent analysis,[8] we next consider whether the police violated the greater privacy protection provided by article I, section 7 in the manner in which they conducted this knock and talk procedure in an effort to obtain Ferrier's consent to search her home. It is significant to our analysis, in this regard, that it is undisputed that Ferrier was in her home when the police initiated contact with her. In addition, the officers admitted that they conducted the knock and talk in order to avoid the necessity of obtaining a search warrant authorizing a search of the home. This, especially, flies in the face of our previous admonition that "`[w]here the police have ample opportunity to obtain a warrant, we do not look kindly on their failure to do so.'" State v. Leach, 113 Wash.2d 735, 744, 782 P.2d 1035 (1989) (quoting approvingly from United States v. Impink, 728 F.2d 1228, 1231 (9th Cir.1984)). Finally, and most importantly, the officers concede that they did not advise Ferrier that she had the right to refuse to consent to a search of her home. Based on these facts, all of which were found by the trial court, we conclude that the knock and talk, as carried out here, *933 violated Ferrier's state constitutional right to privacy in her home and, thus, vitiated the consent she gave. This is so because she was not advised, prior to giving her consent to the search of her home, that she could refuse to consent.
Central to our holding is our belief that any knock and talk is inherently coercive to some degree. While not every knock and talk effort may be accompanied by as great a show of force as was present here, we believe that the great majority of home dwellers confronted by police officers on their doorstep or in their home would not question the absence of a search warrant because they either (1) would not know that a warrant is required; (2) would feel inhibited from requesting its production, even if they knew of the warrant requirement; or (3) would simply be too stunned by the circumstances to make a reasoned decision about whether or not to consent to a warrantless search. In this context, Ferrier's testimony, which was supported by the officers, that she was afraid and nervous seems totally reasonable. Indeed, we are not surprised that, as noted earlier, an officer testified that virtually everyone confronted by a knock and talk accedes to the request to permit a search of their home.
We wish to emphasize that we are not entirely disapproving of the knock and talk procedure, and we understand that its coercive effects are not altogether avoidable. They can, however, be mitigated by requiring officers who conduct the procedure to warn home dwellers of their right to refuse consent to a warrantless search. This would provide greater protection for privacy rights that are protected by the state constitution and would also accord with the state's Fourth Amendment burden of demonstrating, by clear and convincing evidence, that consent to a search was voluntarily given. State v. Smith, 115 Wash.2d 775, 789, 801 P.2d 975 (1990) (citing Shoemaker, 85 Wash.2d at 210, 533 P.2d 123; State v. Nelson, 47 Wash.App. 157, 163, 734 P.2d 516 (1987)).
Our decision is also consistent with that of the New Jersey Supreme Court, which has held under article I, paragraph 7 of its state constitution that "where the State seeks to justify a search on the basis of consent it has the burden of showing that the consent was voluntary, an essential element of which is knowledge of the right to refuse consent."[9]State v. Johnson, 68 N.J. 349, 346 A.2d 66, 68 (1975) (emphasis added). We would simply go further to state the obviousthat the only sure way to give such a protection substance is to require a warning of its existence. If we were to reach any other conclusion, we would not be satisfied that a home dweller who consents to a warrantless search possessed the knowledge necessary to make an informed decision. That being the case, the State would be unable to meet its burden of proving that a knowing and voluntary waiver occurred. As the United States Supreme Court has noted in another context: "For those unaware of the privilege, the warning is needed simply to make them aware of itthe threshold requirement for an intelligent decision as to its exercise." Miranda v. Arizona, 384 U.S. 436, 468, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974 (1966). After all, "[a]ssessments of the knowledge that the defendant possessed ... can never be more than speculation; a warning is a clearcut fact." Miranda, 384 U.S. at 468-69, 86 S.Ct. 1602 (footnote omitted).
In reaching the conclusion we reach here, we are aware that an argument could be made that the rule we adopt today may be somewhat redundant because an officer's request for consent to search already implies that one has the right to refuse that request. That argument is unpersuasive and self-defeating. If we assume that the right to refuse consent is implicit in the request made by the police, then there is no harm in requiring them to explicitly inform the home dweller of that fact. Furthermore, we do not believe that requiring police officers to inform residents of their right to refuse consent *934 to the search will seriously impede the ability of the police to use the knock and talk as an investigative tool, considering that there are many cases where a suspect consented to the search after being informed of the right to refuse consent See, e.g., State v. Stenson, 132 Wash.2d 668, 697, 940 P.2d 1239 (1997) (defendant signed a written consent to search that contained "a clear statement that the Defendant had `the lawful right to refuse to consent to such a search.'") (emphasis added), cert. denied, ___ U.S. ___, 118 S.Ct. 1193, 140 L.Ed.2d 323 (1998); Smith, 115 Wash.2d at 790, 801 P.2d 975 (defendant "signed a written consent to the search which included specific language that documented his right to refuse consent.") (emphasis added); cf. Paul G. Cassell & Bret S. Hayman, Police Interrogation in the 1990s: An Empirical Study of the Effects of Miranda, 43 U.C.L.A. L.REV. 839, 859 (1996) (reporting study showing that 83.7 percent of all criminal suspects waived their Miranda rights).
We believe that the expectation of privacy in the home is clearly "one which a citizen of this state should be entitled to hold," City of Seattle v. McCready, 123 Wash.2d 260, 270, 868 P.2d 134 (1994), because "the home receives heightened constitutional protection." Young, 123 Wash.2d at 185, 867 P.2d 593. In light of the importance that we attach to that right in Washington, we are satisfied that public policy supports adoption of a rule that article I, section 7 is violated whenever the authorities' fail to inform home dwellers of their right to refuse consent to a warrantless search. After all, as we noted earlier, we have already held that the failure to warn is a factor to be employed in assessing the voluntariness of consent under the more permissive Fourth Amendment standard. See Shoemaker, 85 Wash.2d at 212, 533 P.2d 123. In our judgment, further protection for individuals in their home is necessary because, unlike a search warrant, a search resulting from a knock and talk need not be supported by probable cause, or even reasonable suspicion, and the constitutionality of the search might otherwise only be reviewed, if ever, months after the search was conducted at an optional CrR 3.6 suppression hearing. Moreover, unlike a search based upon a warrant, the scope of a consensual search is often not limited to specific areas. See 3 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 8.1, at 596-97 (3d ed.1996).
While we recognize that a home dweller should be permitted to voluntarily consent to a search of his or her home, the waiver of the right to require production of a warrant must, in the final analysis, be the product of an informed decision. We, therefore, adopt the following rule: that when police officers conduct a knock and talk for the purpose of obtaining consent to search a home, and thereby avoid the necessity of obtaining a warrant, they must, prior to entering the home, inform the person from whom consent is sought that he or she may lawfully refuse to consent to the search and that they can revoke, at any time, the consent that they give, and can limit the scope of the consent to certain areas of the home. The failure to provide these warnings, prior to entering the home, vitiates any consent given thereafter.[10]
In light of our holding that the knock and talk procedure involved here was unconstitutional, we need not address Ferrier's argument that what followed, her consent to the search of her home, was involuntarily given.
Finally, we have previously held that "[w]ithout an immediate application of the exclusionary rule whenever an individual's right to privacy is unreasonably invaded, the protections of the Fourth Amendment and Const. art 1, § 7 are seriously eroded." State v. White, 97 Wash.2d 92, 111-12, 640 P.2d 1061 (1982). Accordingly, we conclude that the trial court erred in failing to suppress the evidence obtained in the unlawful search of Ferrier's home. Ferrier's conviction is, therefore, reversed.
DOLLIVER, SMITH, JOHNSON, MADSEN, TALMADGE and SANDERS, JJ., concur.
*935 DURHAM, Chief Justice, (dissenting).
The majority holds that, under article I, section 7 of our state constitution, a person's consent to search his or her home is invalid unless the police expressly inform that person of the right to refuse consent. Because there is no basis for such a rule under our case law, I respectfully dissent.
Ms. Ferrier challenges the validity of her consent under both article I, section 7 of the Washington State Constitution and the fourth amendment to the United States Constitution. The majority observes that this court will resort to independent state constitutional grounds rather than deferring to comparable federal constitutional provisions only when warranted in light of the Gunwall[1] factors. Majority at 930. Given our extensive prior evaluation of article I, section 7 in light of the Gunwall factors, the majority focuses the inquiry on the degree of privacy protection our preexisting state law "has historically afforded to individuals in similar situations." Majority at 930-931. Yet, in justifying a separate state constitutional analysis, the majority fails to cite a single article I, section 7 case involving consent to search a home. Instead, the majority demonstrates only that this court has historically afforded broader state privacy rights against infrared surveillance and against searches of curbside trash, phone records, and dormitory rooms.[2] Were we without any cases more closely on point, these cases might be sufficiently "similar situations" because of the common element of the home. However, we have already determined that federal precedent controls in evaluating consent cases under article I, section 7.
For example, we have expressly adopted federal precedent as determinative in article I, section 7 cases regarding the common authority to consent to search of a home. See State v. Mathe, 102 Wash.2d 537, 543, 688 P.2d 859 (1984) (adopting United States v. Matlock, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974) "as the proper guide to determine test questions of consent issues under Const. art. I, § 7"); State v. Leach, 113 Wash.2d 735, 739, 782 P.2d 1035 (1989) ("This court has expressly adopted the Matlock standard for determining issues of consent under Const. art. 1, § 7."). And, in a case very closely on point, we utilized an exclusively Fourth Amendment analysis to resolve an article I, section 7 challenge to the voluntariness of a person's consent to search his home. McNear v. Rhay, 65 Wash.2d 530, 534, 536-38, 398 P.2d 732 (1965).
Thus, our preexisting case law suggests that Fourth Amendment analysis is appropriate in evaluating the validity of consent to search a home under article I, section 7. Under the Fourth Amendment, the voluntariness of consent to search is a question of fact to be determined by considering the totality of circumstances surrounding the consent. State v. Smith, 115 Wash.2d 775, 801 P.2d 975 (1990). Factors to be considered include whether Miranda warnings had been given prior to obtaining consent, the degree of education and intelligence of the consenting person, and whether the consenting person had been advised of the right not to consent. Smith, 115 Wash.2d at 789, 801 P.2d 975; State v. Shoemaker, 85 Wash.2d 207, 212, 533 P.2d 123 (1975). The Courts of Appeals has also considered (1) whether the police made any express or implied claims of authority to search or enter; (2) previous illegal actions of the police; (3) the defendant's degree of cooperation; and (4) police deception as to identity or purpose. State v. McCrorey, 70 Wash.App. 103, 112, 851 P.2d 1234, review denied, 122 Wash.2d 1013, 863 P.2d 73 (1993); State v. Flowers, 57 Wash.App. 636, 645, 789 P.2d 333, review denied, 115 Wash.2d 1009, 797 P.2d 511 (1990).
In the present case, the police did not give Miranda warnings and did not expressly inform Ms. Ferrier that she could refuse consent; but Ms. Ferrier had completed the *936 11th grade, the police did not claim authority to search or enter, the court found that Ms. Ferrier had cooperated with the police, and there was no indication of police deception or illegal activity. Indeed, the police made clear from the beginning that they wanted permission to search for illegal drug activity and that the fruits of the search would be used against her in court. Under these circumstances, Ms. Ferrier's consent was voluntary and the seized evidence was properly admitted at trial.
I would affirm.
GUY, J., concurs.
NOTES
[1] RCW 69.50.401(a) provides in pertinent part:

"(a) Except as authorized by this chapter, it is unlawful for any person to manufacture ... a controlled substance."
[2] Ferrier also raised double jeopardy and right to counsel issues at the Court of Appeals. She did not, however, raise these issues in her petition to this court.
[3] The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause...."
[4] Regardless, "to apply the federal constitution before the Washington Constitution would be as improper and premature as deciding a case on state constitutional grounds when statutory grounds would have sufficed, and for essentially the same reasons." State v. Coe, 101 Wash.2d 364, 374, 679 P.2d 353 (1984).
[5] Those factors are: (1) the state constitution's textual language; (2) significant textual differences between parallel state and federal constitutional provisions; (3) state constitutional and common law history; and (5) structural differences between the state and federal constitutions. Gunwall, 106 Wash.2d at 61-62, 720 P.2d 808.
[6] We can find a historical antecedent for this principle in a passage quoted in Miller v. United States, 357 U.S. 301, 307, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958), from a speech given in 1763 by William Pitt, the Earl of Chatham, during a debate in Parliament: "`The poorest man may in his cottage bid defiance to all the forces of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England cannot enterall his force dares not cross the threshold of the ruined tenement'"
[7] In Young we held that "in examining our state constitution's explicit protection of the home, the fact the search occurs at a home is central to the analysis." Young, 123 Wash.2d at 185 n. 2, 867 P.2d 593.
[8] The dissent contends that "we have already determined that federal precedent controls in evaluating consent cases under article I, section 7." Dissenting op. at 935. Cited in support of this proposition are "common authority to consent to a search of a home" cases such as State v. Leach, 113 Wash.2d 735, 782 P.2d 1035 (1989). Dissenting op. at 935. We disagree with that contention. The question there was who can provide consent, not whether consent was voluntarily given. See Leach, 113 Wash.2d 735, 782 P.2d 1035. Our holding here is in no way contrary to Leach.

The dissent's more serious criticism of our holding is that "in a case very closely on point, we utilized an exclusively Fourth Amendment analysis to resolve an article I, section 7 challenge to the voluntariness of a person's consent to search his home." Dissenting op. at 935 (citing McNear v. Rhay, 65 Wash.2d 530, 534, 536-38, 398 P.2d 732 (1965)). McNear is inapplicable here, though. Not only does it predate Gunwall, but it even predates this court's first real articulation of the differences between the Fourth Amendment and article I, section 7. See State v. Simpson, 95 Wash.2d 170, 177-78, 622 P.2d 1199 (1980). Article I, section 7 jurisprudence simply cannot be frozen in time as of 1965. "[T]he constitution was not intended to be a static document incapable of coping with changing times. It was meant to be, and is, a living document with current effectiveness." Seattle School Dist. No. 1 v. State, 90 Wash.2d 476, 517, 585 P.2d 71 (1978). McNear does mention, in passing, the defendant's assertions that article I, section 7, along with various other federal and constitutional rights, was violated. See McNear, 65 Wash.2d at 534-35, 398 P.2d 732. However, it does not disclose any effort at independent analysis of article I, section 7. Indeed, after this court's sparse summary of the defendant's assertions McNear never again mentions article I, section 7. Mere silence cannot signal the adoption, forevermore, of a Fourth Amendment voluntary consent analysis. Accordingly, the dissent is left in the unsupported position of being unable to deny that a search of a home is governed by article I, section 7, but arguing that consent to that same search is somehow governed by the Fourth Amendment alone.
[9] This decision was remarkable inasmuch as the court noted that New Jersey's article I, paragraph 7 (quite unlike Washington's article I, section 7) "is taken almost verbatim from the Fourth Amendment and until now has not been held to impose higher or different standards than those called for by the Fourth Amendment." Johnson, 346 A.2d at 68 n. 2. In contrast, we are faced with a clearer imperative.
[10] Although the police procedure involved here was constitutionally infirm, the general use of a "consent to search" form, such as the one signed by Ferrier and the ones found in Stenson and Smith, carries with it the advantage of creating evidence that avoids ambiguity over whether consent was actually given.
[1] State v. Gunwall, 106 Wash.2d 54, 720 P.2d 808, 76 A.L.R.4th 517 (1986).
[2] Majority at 930-931 (citing State v. Young, 123 Wash.2d 173, 188, 867 P.2d 593 (1994); State v. Boland, 115 Wash.2d 571, 578, 800 P.2d 1112 (1990); Gunwall, 106 Wash.2d at 63, 720 P.2d 808; State v. Chrisman, 100 Wash.2d 814, 818, 676 P.2d 419 (1984)).