**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
MARCH 6, 2025

*CHIEF JUSTICE*

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
MARCH 6, 2025

SARAH R. PENDLETON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 102622-6 |
| Respondent, | ) | |
| v. | ) | En Banc |
| MARY MARGARET MERCEDES, | ) | |
| Petitioner. | ) | |
| | ) | Filed: March 6, 2025 |

JOHNSON, J.—This case involves a challenge to a warrantless search of property, which disclosed evidence of criminal animal neglect and cruelty. More specifically, the issue raises a state constitutional argument that under article I, section 7 of the Washington Constitution, consent to enter property is invalid unless investigating officers advise the property owner of the right to refuse, limit, and revoke consent, which we adopted as required to enter a person's home to search for evidence of a crime. *State v. Ferrier*, 136 Wn.2d 103, 960 P.2d 927 (1998).

Two counts of animal cruelty were brought based on evidence obtained in a search pursuant to a search warrant, which was issued based on observations contained in a supporting affidavit gathered by officers during several visits to the property. The trial court granted a motion to suppress, holding that the consent to enter the property was invalid, and dismissed. The State appealed, and the Court of Appeals reversed. *State v. Mercedes*, No. 84469-5-I (Wash. Ct. App. Nov. 6, 2023) (unpublished), https://www.courts.wa.gov/opinions/pdf/844695.pdf, *review granted*, 2 Wn.3d 1028 (2024). We conclude *Ferrier* warnings were not required. We affirm the Court of Appeals and remand.

FACTS AND PROCEDURAL HISTORY

Between January 4 and February 23, 2018, Snohomish County Animal Services received multiple complaints that animals on Mary Mercedes's property were being starved and neglected.

An employee from the adjoining horse ranch made the initial complaint after that ranch's veterinarian saw the animals on Ms. Mercedes's property and stated that the horses were emaciated and that a lamb was dying. Animal Control Officer Rench went to Ms. Mercedes's rural 2.89-acre property to investigate the complaint and returned several more times over the following seven-week period. Another employee at that ranch made the final complaint on February 23, claiming

2

Ms. Mercedes was not feeding her horses or providing them access to water. This complaint prompted a second officer, Officer Wiersma, to visit the property.

The property is accessed via a long, gated driveway that was open at every visit except one. Past the driveway gate, Ms. Mercedes's pasture borders the circular driveway area, which is surrounded by a three-rail fence. Thus, from the driveway, visitors to the property can see into the pasture.

During the initial visit, Ms. Mercedes met Officer Rench outside, where the officer explained the complaint and asked questions about the animals on the property. When Officer Rench asked to see the animals, Ms. Mercedes agreed and led the officer to them. The two viewed the animals from outside the enclosure. Officer Rench gave Ms. Mercedes recommendations for what to feed the animals to improve their health. She also instructed Ms. Mercedes to promptly set up an appointment with a veterinarian to examine the animals and develop a more specific feeding and care plan to improve their health status. At the end of that first visit, Officer Rench informed Ms. Mercedes that she would return to the property to monitor the animals' conditions.

At the second visit, Ms. Mercedes informed Officer Rench that she had an appointment with a veterinarian to come see the animals the next day. Officer Rench told Ms. Mercedes that she would be there during the appointment as part of

monitoring Ms. Mercedes's efforts to rehabilitate the animals. The veterinarian addressed some of the animals' care needs and gave Ms. Mercedes a feeding plan.

During the subsequent visits, Officer Rench generally asked Ms. Mercedes for updates on the animals' care and requested to see the animals. Ms. Mercedes allowed the officer's requests.

Usually, Ms. Mercedes met the officer outside in the driveway area, which included a grassy area between the fenced pasture and driveway. On the one occasion when the driveway gate was closed, Ms. Mercedes met the officer at the gate. When Officer Rench asked to see the animals on that occasion, Ms. Mercedes opened the gate.

After the February 23 visit, Officer Rench sought a warrant to search the property and seize the horses along with any relevant veterinary or health records relating to the care of the two horses. The warrant application contained the observations gathered during the property visits among other evidence. The trial court issued the warrant. The officers returned the following day with the warrant and searched the property for more evidence related to the horses' care. They brought a veterinarian who examined the horses and concluded that they were still emaciated. The officers seized the horses to provide them with needed care.

The State charged Ms. Mercedes with two counts of animal cruelty. She filed a motion to suppress the evidence the officers obtained from being on her

property, claiming that without providing *Ferrier* warnings before entering the property, the State had not established valid consent to enter the property. At the hearing, Officer Rench labeled her first visit as a type of "knock-and-talk procedure." 1 Verbatim Rep. of Proc. (VRP) at 25. She defined such a procedure as "[t]he right to go to the front door and ask questions and explain a complaint." 1 VRP at 25. The trial court did not make any finding regarding whether the investigation was a knock and talk. It did find the officers' investigations were searches once the officers were off the driveway and when physically assessing the animals.

The trial court concluded *Ferrier* warnings were required when seeking consent to see the animals and to venture beyond the driveway. It suppressed any evidence obtained while at Ms. Mercedes's property except for the officers' observations from the driveway vantage point. It then found no probable cause supported the search warrant and dismissed the State's case against Ms. Mercedes.

The State appealed the trial court's order suppressing the evidence and conclusion of law that *Ferrier* applied to the search of Ms. Mercedes's outdoor property. The Court of Appeals, in a split decision, concluded that *Ferrier* applies only to the search of a person's home. It reversed and remanded to the trial court to determine whether Ms. Mercedes's consent was voluntary under the totality of the circumstances. We granted review.

ANALYSIS

Article I, section 7 provides, "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." Generally, under our article I, section 7 cases, searches are valid when done pursuant to a properly issued search warrant. Exceptions to the warrant requirement are narrow. The exception at issue here is the validity of consent by an individual. The State has the burden to establish that an individual consented to any search conducted without a warrant. For consent to be valid when a law enforcement officer seeks consent to conduct a warrantless search of a person's home under certain circumstances, we have held that the officer must first inform the individual they have the right to refuse, limit, and revoke consent. *Ferrier*, 136 Wn.2d at 118-19. Ms. Mercedes asserts that here, Officers Rench and Wiersma conducted "knock and talk" investigations on her property and that automatically triggered *Ferrier* requirements.

*Ferrier* involved a situation where police officers got a tip about a marijuana grow operation inside Ferrier's home. Four officers went to her home, knocked on her door, and, while stepping inside, stated they were there to discuss her son. They told Ferrier about the information they received about the grow operation and asked consent to search her home for evidence. At this point, Ferrier, who was frightened and upset, consented. One officer witness in *Ferrier* described their approach in getting into Ferrier's home as a knock and talk. He explained it as

when an officer, without a search warrant, goes to an individual's home, knocks on the door, and asks permission to enter the house to discuss the complaint against that individual. One of the officers admitted their method for getting inside and obtaining consent to search was done to circumvent the search warrant process. The officer expressed concern about applying for a search warrant that might divulge the informant's identity. We held that the knock and talk procedure and entry into the home was nonconsensual and listed specific requirements applicable to establish valid consent under those circumstances. We adopted the rule that a resident must be advised they can refuse, limit, and revoke consent when officers request entry into their home to conduct a warrantless search. *Ferrier*, 136 Wn.2d 103. Our cases later limited the scope of that requirement and held that under other circumstances, law enforcement officers are not always required to provide *Ferrier* warnings when seeking consent to enter someone's home.

In *State v. Khounvichai*, 149 Wn.2d 557, 559, 69 P.3d 862 (2003), two police officers asked to enter an individual's apartment to speak with her grandson who was living there. While inside, the officers saw Khounvichai make a sudden dash across the room and out of sight. Worried he was going for a weapon, one officer secured Khounvichai and discovered he was holding a bag of cocaine. After charges were brought against Khounvichai for possessing cocaine, he moved to suppress the cocaine because the officers failed to provide *Ferrier* warnings to the

apartment tenant before entering. We rejected this argument. Relying on the language in *Ferrier*, we explained that the underlying purpose of the officers' visit was significant. Where officers are at a person's doorstep for merely investigative purposes, such as when responding to reported criminal activity, *Ferrier* warnings are not needed. We explained the distinction and reasoned that for valid consent when "police seek entry to a home to conduct a warrantless search *for contraband or evidence of a crime*," they must inform the home dweller they can refuse, limit, and revoke consent to enter their home. *Khounvichai*, 149 Wn.2d at 566 (emphasis added). Since *Khounvichai* did not involve that conduct, we upheld the search.

Similarly, in *State v. Ruem*, 179 Wn.2d 195, 313 P.3d 1156 (2013) (plurality opinion), we reiterated that the purpose of an officer's entry into a home is instructive of the circumstances where *Ferrier* applies. In that case, police had an arrest warrant for a certain individual, Chantha. During an attempt to serve the warrant at the residence where the officer believed Chantha lived, an occupant, Ruem, told the officer that Chantha had moved away. When the officer asked for consent to look inside, Ruem initially consented and then immediately changed his mind saying it was "'not a good time.'" *Ruem*, 179 Wn.2d at 198 (internal quotation marks omitted) (quoting court papers). The officer had already entered and smelled marijuana. The officer assured Ruem he was only there to look for Chantha. While in the house, the officer saw several marijuana plants and arrested

Ruem. After being charged, Ruem moved to suppress all evidence the officer gathered while in his home on the basis the officer failed to give Ruem *Ferrier* warnings. We held that *Ferrier* did not apply. In our analysis, we again focused on the purpose of the visit and stated that *Ferrier* warnings "apply when police conduct a 'knock and talk.'" *Ruem*, 179 Wn.2d at 206. We held that *Ferrier* warnings were not required before entering Ruem's home, reasoning that the officers sought entry into Ruem's home to execute the arrest warrant for Chantha, and not for the purpose of searching for contraband or evidence of a crime.

In *State v. Budd*, 185 Wn.2d 566, 569, 374 P.3d 137 (2016), we held that under the circumstances there, *Ferrier* advisement was required. In that case, police officers met Budd on his driveway and then, after discussing why they were there, requested entry into his home to seize a computer they suspected contained contraband. Budd agreed to let them inside specifically for that limited purpose. Only after the officers were inside the home did they provide Budd with a written consent form containing *Ferrier* warnings. We characterized the officers' visit as a type of knock and talk in which the entry was for the purpose of searching for and seizing a computer as evidence of a crime. Our analysis focused on the purpose of the officers' entry: "to search for and seize suspected contraband." *Budd*, 185 Wn.2d at 573-74. Under the facts, we held that *Ferrier* warnings were required before the officers' entry into the home to establish valid consent.

9

Here, Officer Rench did not attempt to enter Ms. Mercedes's home. Officer Rench's own characterization of the visit as being a knock and talk is irrelevant in deciding the applicability of *Ferrier* warnings. The officer asked for consent to look at the animals from the outside of the enclosure and not from inside the home. Further, the purpose of Officer Rench's initial visit was to investigate a report of animal cruelty and determine if circumstances existed to seize the animals, not to search for contraband or evidence of a crime. The purpose of Officer Rench's follow-up visits was to monitor Ms. Mercedes's compliance with the feeding and care recommendations given by the veterinarian to determine if further action would be needed. The purpose of Officer Wiersma's visit was to investigate another complaint, which included determining if the animals had access to food and drinking water. Because the visits were for investigative purposes and were conducted outside of the home, these circumstances do not trigger *Ferrier* requirements.

Ms. Mercedes argues the *Ferrier* requirements should not be limited to homes but, more broadly, to constitutionally recognized private affairs under article I, section 7, and that no distinction exists between invading a person's home and disturbing their private affairs. She argues that a consistent rule should exist for establishing consent for *all* privacy interests. We disagree. Our constitution establishes that the government cannot invade a home or disturb a private affair

10

without a warrant unless an exception to the warrant requirement exists, consent being a recognized exception. What the cases discussed above hold is a consistent rejection of arguments made to expand the scope of constitutional privacy protections beyond what *Ferrier* established.

In declining to expand *Ferrier*'s added protection more broadly, we do not diminish the State's high burden to establish valid consent to warrantless searches. The standard to establish valid consent, which is the totality of circumstances analysis, remains intact. *Ruem*, 179 Wn.2d at 207. The State still has the burden to prove the validity of Ms. Mercedes's consent based on the totality of the circumstances. The Court of Appeals correctly remanded the case to the trial court to determine whether the State can meet this burden. Accordingly, we affirm the decision of the Court of Appeals and remand.

Johnson, J.

WE CONCUR:

Madsen, J.

Yu, J.

Whitener, J.

No. 102622-6

STEPHENS, C.J. (concurring)—I join the lead opinion's holding that the evidence obtained while at Ms. Mercedes's property should not have been suppressed due to a lack of *Ferrier* warnings. The protection against coerced consent that *Ferrier* addresses was not implicated here, as the animal control officers' purpose was to follow up on a report of animal cruelty and monitor Mercedes's compliance with veterinary recommendations, not to seize contraband or evidence of a crime. I write separately to emphasize that any commentary about whether Mercedes's horse pasture was part of her home is unnecessary to this result.

We have long recognized that "the home receives heightened constitutional protection." *State v. Young*, 123 Wn.2d 173, 185, 867 P.2d 593 (1994). In *Ferrier*, we articulated a prophylactic protection against invasions of individual privacy by requiring police to inform people of their right to refuse consent before conducting a warrantless search within their home. *State v. Ferrier*, 136 Wn.2d 103, 118, 960 P.2d 927 (1998). Subsequent cases clarified that the *Ferrier* rule applies only when police conduct a "knock and talk," i.e., when their purpose is to search for and seize contraband or evidence of an already completed crime within the home. *See State v. Khounvichai*, 149 Wn.2d 557, 69 P.3d 862 (2003) (holding *Ferrier* warning not required when seeking entry to home to question resident);

1

*State v. Ruem*, 179 Wn.2d 195, 313 P.3d 1156 (2013) (holding *Ferrier* warning not

required when seeking entry to home to execute arrest warrant); *State v. Budd*, 185

Wn.2d 566, 374 P.3d 137 (2016) (holding *Ferrier* warning required when seeking

entry to home to seize contraband).  While these cases all involved a residence

with four walls, a roof, and a front door (including a mobile home in *Ruem*), our

holdings did not turn on the physical qualities of the structure but, rather, the police

officers' method and purpose for seeking entry to the home.  This is because in

*Ferrier*, we recognized the inherently coercive nature of the knock and talk

procedure in which police confront a person they already suspect to be guilty of a

crime at the threshold of the place where they are entitled to heightened

constitutional protection.  *See Ferrier*, 136 Wn.2d at 115.  We have never

suggested that this inherent coercion disappears when police confront a person at

the gate of a fence and seek consent to search for evidence in an outdoor part of

their home.

      Washingtonians live in a variety of settings.  There are many types of

homes, ranging from apartments and accessory dwelling units in urban and

suburban areas to parcels in rural areas that may contain multiple structures.

People typically sleep inside a building or structure (though not always), and they

often use the space in and around that structure to eat, talk, exercise, play, store

belongings, or raise plants and animals.  However they live, they have a reasonable

expectation of privacy in the objects and activities in their home, except for what they knowingly expose to the plain view of outsiders. *See State v. Berber*, 48 Wn. App. 583, 591, 740 P.2d 863 (1987) (quoting *Katz v. United States*, 389 U.S. 347, 361, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967) (Harlan, J., concurring)). People can shield the outdoor parts of their home from the public view in a number of ways, including with a fence or awning, or by locating objects and activities far from fence lines or a public road. The determination of what constitutes a person's home is highly fact specific and must account for the diverse ways that people in Washington live their lives.

I would not limit the heightened constitutional protection *Ferrier* recognizes in the home solely to the inside of dwellings, as Justice Pro Tempore Melnick's concurrence suggests. I do not read *Ferrier* as tying its protection to RCW 10.79.040 in such a restrictive way. Rather, *Ferrier* affirms the principle that "the closer officers come to intrusion into a dwelling, the greater the constitutional protection." *State v. Chrisman*, 100 Wn.2d 814, 820, 676 P.2d 419 (1984). Far from suggesting that the home is limited to the four walls of a building where people sleep, this quote underscores the fundamental notion that a person's home is their castle.[1] What constitutes the home is best understood with reference not to

---

[1] *See* James Otis, *Against Writs of Assistance* (1761), NAT'L CONST. CTR., https://constitutioncenter.org/the-constitution/historic-document-library/detail/james-otis-against-writs-of-assistance-february-24-1761 [https://perma.cc/YWT7-BR6Q].

structural details but to the reason why the home deserves special protection as a person's private space.

This case does not require the court to define the boundaries of the home for purposes of article I, section 7 because the officers' actions here did not implicate the need for *Ferrier* warnings. Each time the officers visited Mercedes's home and sought entry into her horse pasture, their purpose was to follow up on allegations of animal cruelty and monitor Mercedes's compliance with the veterinarian's horse care recommendations, not to seize evidence of a crime they had already determined to be committed by Mercedes. The officers' actions here do not resemble the show of authority and inherent coercion that rendered Ferrier's consent invalid without a warning of her right to refuse consent.

I join the lead opinion in holding that *Ferrier* warnings were not required in this case and that the evidence obtained should not have been suppressed. Officers did not conduct a knock and talk to search for and seize evidence of a crime at Mercedes's home. On this basis, I respectfully concur.

_____
Stephens, C.J.

_____
Gordon McCloud, J.

_____
Yu, J.

_____
Montoya-Lewis, J.

No. 102622-6

MELNICK, J.\* (concurring)—I respectfully concur in the lead opinion's decision to affirm the Court of Appeals and to remand to the trial court. I would decide this case solely on the narrow grounds that the consent to search the defendant's property did not involve a home.

As the lead opinion clearly points out, the rule of *State v. Ferrier*, 136 Wn.2d 103, 960 P.2d 927 (1998), and its progeny all involve law enforcement seeking consent to search a home or a dwelling. The constitutional right at issue in *Ferrier* involved the "heightened privacy rights in her home, as guaranteed by article I, section 7 of [Washington's] constitution...." 136 Wn.2d at 106. "Especially evident is the fact that '[i]n no area is a citizen more entitled to his privacy than in his or her home. For this reason, the closer officers come to intrusion into a dwelling, the greater the constitutional protection.'" *Ferrier*, 136 Wn.2d at 112 (alteration in original) (internal quotation marks omitted) (quoting *State v. Young*, 123 Wn.2d 173, 185, 867 P.2d 593 (1994)).

For support, the court cited to former RCW 10.79.040 (1921), which reads as follows: "It shall be unlawful for any policeman or other peace officer

---

\* Judge Rich Melnick is serving as a justice pro tempore of the Supreme Court pursuant to Washington Constitution article IV, section 2(a).

to enter and search any private dwelling house or place of residence without the authority of a search warrant issued upon a complaint as by law provided."[1]  *Ferrier*, 136 Wn.2d at 112.

*Ferrier* recognized that "a home dweller should be permitted to voluntarily consent to a search of his or her home, [but] the waiver of the right to require production of a warrant must, in the final analysis, be the product of an informed decision. 136 Wn.2d at 118.

This analysis is consistent with subsequent decisions from this court.  "It would also distort the purpose of *Ferrier,* which is to ensure that a person who has *not* been illegally seized can make an informed decision as to whether to consent to a search of his or her home." *State v. Mayfield*, 192 Wn.2d 871, 901, 434 P.3d 58 (2019).

> *Ferrier* requires that police officers "must, prior to entering the home, inform the person from whom consent is sought that he or she may lawfully refuse to consent to the search and that they can revoke, at any time, the consent that they give, and can limit the scope of the consent to certain areas of the home." 136 Wn.2d at 118. Officers must give these warnings before entering the home because the resident's knowledge of the privilege is a " 'threshold requirement for an intelligent decision as to its exercise.' " *Id.* at 117 (quoting *Miranda v. Arizona*, 384 U.S. 436, 468, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)). "The failure to provide these warnings, prior to entering the home, vitiates any consent given thereafter." *Id.* at 118–19.

*State v. Budd*, 185 Wn.2d 566, 573, 374 P.3d 137 (2016).

Although this court has consistently confined *Ferrier* warnings to knock and talk procedures, *Budd*, 185 Wn.2d at 573, the petition in this case only

---

[1] RCW 10.79.040 has been amended to read, in pertinent part, "It shall be unlawful for any police officer or other peace officer to enter and search any private dwelling house or place of residence without the authority of a search warrant issued upon a complaint as by law provided." LAWS OF 2010, ch. 8, § 1062.

sought review, and we only granted review, on the issue of whether *Ferrier* warnings are required when officers seek consent to search a gated, fenced area surrounding a home. Pet. for Rev. at 2. The petitioner argued that the constitutional basis of *Ferrier* extends to private areas surrounding a person's home. Pet. for Rev. at 12. The issue of whether this consent search involved a knock and talk has neither been briefed nor argued. The trial court made no findings of fact on this issue. We should generally "decide a case only on the basis of issues set forth by the parties in their briefs." RAP 12.1(a).

Since it is unquestioned that this case does not involve a consent search of a home, I would end the inquiry at that point. An analysis and discussion of the investigative technique employed by law enforcement in this case is unnecessary, especially considering that the trial court did not make any findings regarding this issue.

Because this case involves the consent to search fenced areas of the defendant's property, and not her home, I join the lead opinion in affirming the Court of Appeals and remanding to the trial court.

Melnick, J.P.T.

González, J.

3