[No. 11768-8-I.   Division One.   August 22, 1983.]

THE STATE OF WASHINGTON, *Respondent,* v. LESLIE MATHE, *Appellant.*

*Michael Filipovic* of *Seattle–King County Public Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Joanne Y. Maida, Deputy,* for respondent.

CALLOW, J.—Leslie Mathe appeals the trial court's judgment that the search of his bedroom was consensual. He also appeals a jury verdict finding him guilty of two counts of first degree robbery while armed with a deadly weapon and firearm.

The issues are:

1. Does an owner–occupant's consent to the search of his home extend to the search of a roommate's bedroom where the bedroom door was open and the police did not know that the owner–occupant shared his home with rent–paying friends?

    (a) Did the owner–occupant consent to the search of his home?

    (b) Did the owner–occupant have authority to consent to the search of his roommate's bedroom?

2. Does Mathe's conviction for violating the deadly weapon statute and the firearm statute, in addition to his conviction for first degree robbery, violate his constitutional right against double jeopardy?

3. Was there sufficient evidence to establish that Mathe committed the two robberies while armed with a real and operable firearm?

4. Did the prosecutor commit prejudicial and reversible error during closing argument by allegedly misstating the law and misleading the jury as to the burdens of proof?

On September 25, 1981, Danielson's Westwood Jewelers in Burien was robbed. The owner of Danielson's Westwood Jewelers, "J," testified that a man walked in and asked to see some rings. The man opened his coat to reveal a gun stuck in the waist of his pants and ordered "J" to put the rings in two paper sacks. Instead, she ran out the front door to call the police. Meanwhile, the robber took six display

cases of rings and fled.

On November 27, 1981, "M" of Westside Prescriptions was robbed at gunpoint. "M" described her assailant as an olive complexioned man, about 28, 5 feet 8 inches, black wavy hair and mustache, dark eyes, wearing a black and beige plaid jacket and carrying a white canvas bag.

On December 31, 1981, several police officers proceeded to a house in West Seattle to locate John Benlien, a suspect in one of several area robberies. With the aid of a reliable informant, the police were aware that both Benlien and a person named "Leslie" spent a great deal of time at the residence. While the police had no prior contact with the person known as "Leslie," they were aware that the description of the person known as "Leslie" matched the description of the robber in the Westside Prescriptions robbery. Prior investigation revealed that the house was owned by James Hartz. The police did not know who else lived there. They planned to obtain permission to look around the house. If permission was not granted, the house would have been kept under surveillance to photograph anyone leaving it.

Hartz answered the door of his residence. The police identified themselves and asked if John Benlien was there. Hartz said no. The police testified that Hartz said that he had no objection to the police looking around. The police proceeded to the back of the house and passed one open bedroom. They took one step into the other open bedroom and discovered Mathe and a woman lying on a mattress on the floor with a shotgun nearby. Based on "M"'s description, the officer recognized Mathe as the suspect in the Westside Prescriptions robbery.

Mathe and the woman were ordered out to the living room and away from the shotgun. The parties were told they were not under arrest and a request for identification was made. Mathe led a police officer to a cream–colored bag which contained his identification. The bag matched the description of one used during two area robberies. The police then asked if they could take Polaroid pictures of

Mathe. Mathe voluntarily agreed. The Polaroid pictures were used in a photo montage and shown to "M" who made a positive identification. Mathe was then formally arrested and advised of his rights.

On January 5, 1982, Mathe was formally charged with the robbery of Westside Prescriptions. Later, an amended information was filed charging Mathe with a second count of first degree robbery while armed with a deadly weapon and firearm. Count 2 alleged that Mathe had robbed Danielson's Westwood Jewelers. "J" had attended a lineup and positively identified Mathe. Further, both "M" and "J" made positive in–court identifications of Mathe, and two witnesses to the Danielson's Westwood Jewelers robbery positively identified Mathe in a lineup and in court.

At the CrR 3.6 suppression hearing, the court found that Hartz had invited the officers in, had given permission for them to look around, and that the warrantless entry into the open bedroom rented by Mathe was justified by the consent of Hartz. The court denied Mathe's motion to suppress any evidence which resulted from the warrantless entry of Mathe's room.

The first issue is whether Hartz's consent to the search of his home extended to the search of Mathe's bedroom where the bedroom door was open and the police were not aware that Hartz shared his home with rent–paying friends.

The search of property, without a warrant and without probable cause, but with proper and voluntary consent, is valid under the Fourth Amendment. Whether consent to search Hartz's house was freely given is a question of fact to be determined by the totality of the circumstances. *Schneckloth v. Bustamonte,* 412 U.S. 218, 36 L. Ed. 2d 854, 93 S. Ct. 2041 (1973); *see State v. Cole,* 31 Wn. App. 501, 643 P.2d 675 (1982). Absent a warrant, the burden is on the State to show by clear and convincing evidence that the consent was truly voluntary and fully informed. *State v. Shoemaker,* 85 Wn.2d 207, 533 P.2d 123 (1975); *State v. Cole, supra.*

We find Hartz's consent to the search of his home to

be valid. While Hartz may not have specifically given the officers consent to enter Mathe's bedroom, the record shows by clear and convincing evidence that Hartz consented to the officers looking around his house. The trial court's finding that Hartz consented to the search of his house is affirmed.

Mathe contends that Hartz did not have authority to consent to the search of his bedroom. Hartz was the owner of the house and had rented his back bedroom to Mathe and the woman for $60 per month for about 6 months.

The issue of whether an owner–occupant may consent to the search of the home he shares with rent–paying friends presents a novel question in Washington.

*Rakas v. Illinois,* 439 U.S. 128, 151, 58 L. Ed. 2d 387, 99 S. Ct. 421 (1978) stated the

> sounder standard for determining the scope of a person's Fourth Amendment rights: Only legitimate expectations of privacy are protected by the Constitution. . . . [I]t is not enough that an individual desired or anticipated that he would be free from governmental intrusion. Rather, for an expectation to deserve the protection of the Fourth Amendment, it must "be one that society is prepared to recognize as 'reasonable.'"

*United States v. Knotts,* ___ U.S. ___, 75 L. Ed. 2d 55, 103 S. Ct. 1081, 1085 (1983) recently re–elaborated the principles of the Fourth Amendment as it applies to the area of search and seizure:

> "Consistently with *Katz* [*v. United States,* 389 U.S. 347, 19 L. Ed. 2d 576, 88 S. Ct. 507 (1967)], this Court uniformly has held that the application of the Fourth Amendment depends on whether the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action. . . . This inquiry, as Justice Harlan aptly noted in his *Katz* concurrence, normally embraces two discrete questions. The first is whether the individual, by his conduct, has 'exhibited an actual (subjective) expectation of privacy,' 389 U. S., at 361—whether, in the words of the *Katz* majority, the individual has shown that 'he seeks to preserve

[something] as private.' *Id.,* at 351. The second question is whether the individual's subjective expectation of privacy is 'one that society is prepared to recognize as "reasonable,"' *id.,* at 361—whether, in the words of the *Katz* majority, the individual's expectation, viewed objectively, is 'justifiable' under the circumstances. *Id.,* at 353. *See Rakas* v. *Illinois,* 439 U. S., at 143–144, n. 12; *id.,* at 151 (concurring opinion); *United States* v. *White,* 401 U. S., at 752 (plurality opinion)." [*Smith v. Maryland,* 442 U.S. 735, 740–41, 61 L. Ed. 2d 220, 99 S. Ct. 2577 (1979)] (footnote omitted).

*United States v. Matlock,* 415 U.S. 164, 170, 39 L. Ed. 2d 242, 94 S. Ct. 988 (1974) considered the problem of third party consenters, stating:

[M]ore recent authority here clearly indicates that the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared.

The Court concluded that those with equal rights of occupancy could authorize a search of the premises so long as there was "common authority" and the third party consenter had a "sufficient relationship to the premises." 415 U.S. at 171. In a footnote to the holding, the Court stated:

Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third–party consent . . . rests . . . on mutual use of the property by persons generally having joint access or control for most purposes, so that it is *reasonable to recognize that any of the co–inhabitants has the right to permit the inspection* in his own right and that *the others have assumed the risk* that one of their number might permit the common area to be searched.

(Italics ours.) 415 U.S. at 171 n.7.

*State v. Christian,* 95 Wn.2d 655, 628 P.2d 806 (1981) involved a landlord's consent to search the premises of a tenant's apartment. The tenant's lease had expired, the tenant was in the process of vacating the apartment, and the landlord had informed the tenant that he intended to enter the apartment after noon of the day following the

expiration of the lease. After reasonably believing the tenants had moved out, the landlord entered the apartment and discovered white powder in plastic bags, a set of scales, and two hypodermic needles. The landlord called the police who accompanied him back to the apartment and seized the evidence. Christian and his brother were subsequently arrested and convicted of the unlawful possession of a controlled substance.

*Christian* affirmed the trial court's conclusion that the search was valid using the reasonable expectation of privacy test enunciated in *Katz v. United States, supra,* and the assumption of the risk test stated in *United States v. Matlock, supra.*

> The test for determining whether the Fourth Amendment applies is first whether "a person [has] exhibited an actual (subjective) expectation of privacy and, second, [whether] that . . . expectation [is] one that society is prepared to recognize as 'reasonable.'" *Katz v. United States,* 389 U.S. 347, 361, 19 L. Ed. 2d 576, 88 S. Ct. 507 (1967) (Harlan, J., concurring).

*State v. Christian, supra* at 659.

The *Christian* court interpreted *Matlock*'s footnote as placing the focus of the analysis on

> whether there was an *assumption of risk* that the other party would exercise his or her right to enter upon and inspect the premises and permit others to do so. *The focus [is] not on whether there was actual use or joint control for most purposes.*

(Last italics ours.) *State v. Christian, supra* at 660.

While it is undisputed that Hartz owned the house in question, ownership alone will not suffice to give Hartz "common authority" over the premises. Mathe testified that he had exclusive possession and occupancy of the room with a woman. However, the door to the bedroom was left wide open while Mathe and the woman slept. Further, unlike a boardinghouse situation, there was no testimony of a lock on Mathe's door to totally exclude others from entering his room while he was absent. Mathe testified to a subjective expectation of privacy. Under the circumstances,

his expectation of privacy was not objectively reasonable: the door was left open while he slept; it appears that Mathe, the woman, and Hartz were mutual friends and acquaintances, and that Mathe had resided in Hartz's home for only 6 months on a more or less temporary nature. Mathe assumed the risk that Hartz would enter the bedroom or permit others to do so. The trial court's denial of Mathe's motion to suppress is affirmed.

The second issue is whether Mathe's conviction for violating the deadly weapon statute and the firearm statute, in addition to his conviction for first degree robbery, violated his constitutional right against double jeopardy.

■ Mathe's constitutional right against double jeopardy was not violated. Both the Legislature and the courts have sanctioned the use of the deadly weapon statute, RCW 9.95.040, and the firearm statute, RCW 9.41.025, in a conviction for first degree robbery. *See State v. Workman*, 90 Wn.2d 443, 584 P.2d 382 (1978). Furthermore, *Missouri v. Hunter*, ___ U.S. ___, 74 L. Ed. 2d 535, 103 S. Ct. 673, 679 (1983) recently stated:

> Where . . . a legislature specifically authorizes cumulative punishment under two statutes, regardless of whether those two statutes proscribe the "same" conduct . . . the prosecutor may seek and the trial court or jury may impose cumulative punishment under such statutes in a single trial.

The third issue is whether there was sufficient evidence to establish that Mathe had committed the robberies while armed with a real and operable firearm.

Mathe claims the circumstantial evidence presented by the State was insufficient to establish he had used a real and operable gun during the commission of the two robberies. The alleged guns were never recovered and introduced into evidence. He claims that the circumstantial evidence was insufficient to sustain the State's burden of proof beyond a reasonable doubt.

■ The test for determining the sufficiency of the evidence is

whether, after viewing the evidence in the light most favorable to the prosecution, *any rational trier of fact* could have found the essential elements of the crime *beyond a reasonable doubt.*

*State v. Green,* 94 Wn.2d 216, 221, 616 P.2d 628 (1980) (quoting *Jackson v. Virginia,* 443 U.S. 307, 61 L. Ed. 2d 560, 99 S. Ct. 2781 (1979)). The reviewing court itself need not be convinced of the defendant's guilt beyond a reasonable doubt. *State v. Franco,* 96 Wn.2d 816, 823, 639 P.2d 1320 (1982); *State v. Green, supra* at 221. "Neither does this rule undermine the deference courts traditionally give to the jury or other trier of fact to resolve conflicts in testimony, weigh evidence and draw reasonable inferences therefrom." *State v. Gerber,* 28 Wn. App. 214, 216, 622 P.2d 888 (1981); *see Jackson v. Virginia, supra* at 319.

Mathe correctly asserts that *State v. Tongate,* 93 Wn.2d 751, 613 P.2d 121 (1980) and *State v. Pam,* 98 Wn.2d 748, 659 P.2d 454 (1983) held that the State must prove beyond a reasonable doubt the presence of a deadly weapon and firearm *in fact. Tongate* held that the enhanced punishment under RCW 9.95.040 requires proof beyond a reasonable doubt of an actual weapon. The trial court's failure to specifically instruct the jury on the State's burden of proof regarding the special verdict resulted in the reversal of Tongate's conviction for violating RCW 9.95.040. In *Pam,* the trial court also failed to instruct the jury on the State's burden of proof regarding RCW 9.95.040 and 9.41.025. Because no bullets were fired, the alleged deadly weapon and firearm fell apart as the defendant fled, and only the wooden forestock of "what appeared to be part of a shotgun" was recovered, *Pam* held that "[w]ith the appropriate instructions, a rational jury could have a reasonable doubt as to the operability of the weapon." *State v. Pam, supra* at 755.

Here, the jury was properly instructed on the State's burden of proof. Both "M" and "J" described in detail the guns used by Mathe during the robberies. Looking at the evidence in the light most favorable to the State, a rational

trier of fact could have found beyond a reasonable doubt that Mathe used a real and operable gun during the two robberies. While evidence of the deadly weapon and firearm was circumstantial, "[i]n determining the sufficiency of the evidence, circumstantial evidence is not to be considered any less reliable than direct evidence." *State v. Delmarter,* 94 Wn.2d 634, 638, 618 P.2d 99 (1980); *see State v. Gosby,* 85 Wn.2d 758, 539 P.2d 680 (1975).

The fourth issue is whether the prosecutor committed prejudicial and reversible error during closing argument by allegedly misstating the law and misleading the jury as to the burdens of proof.

Mathe claims that during closing argument, the prosecutor made inflammatory comments which expressed her personal opinion, and misstated the law and burdens of proof in regard to the special allegations. As a result, Mathe claims his constitutional rights were violated. Because the errors claimed by Mathe involve errors of possible constitutional magnitude, we may consider them for the first time on review. *State v. Green, supra* at 231.

▋ "[A] case should not be reversed for improper argument of law by counsel, unless such error is prejudicial to the accused." *State v. Estill,* 80 Wn.2d 196, 200, 492 P.2d 1037 (1972). Statements made during closing argument, when taken out of context, often sound like the expression of a personal opinion. Such statements are to be reviewed in light of the total argument, the issues in the case, the evidence discussed during the argument, and the instructions given. Improper remarks of the prosecutor will not constitute reversible error if the instructions given substantially mitigated any prejudicial effect of the improper remarks. *State v. Papadopoulos,* 34 Wn. App. 397, 400–01, 662 P.2d 59 (1983).

Looking at the totality of the circumstances, the prosecutor's comments were not so inflammatory nor so prejudicial as to deny Mathe a fair trial. The jury was instructed:

Counsel's remarks, statements and arguments are intended to help you understand the evidence and apply

the law. They are not evidence, however, and you should disregard any remark, statement or argument which is not supported by the evidence or the law given to you by the court.

The "technicality" the prosecutor referred to during argument and which Mathe assigns error to was in reply to the defense's argument that without the gun in court, the jury could never find beyond a reasonable doubt that Mathe used a deadly weapon and firearm *in fact*. Any improper comment on the part of the prosecutor was harmless beyond a reasonable doubt.

The judgment is affirmed.

ANDERSEN, C.J., and WILLIAMS, J., concur.

Reconsideration denied September 20, 1983.

Review granted by Supreme Court December 2, 1983.