[No. 22448-8-II.   Division Two.   June 11, 1999.]

THE STATE OF WASHINGTON, *Respondent*, v. JAMES M. LEUPP, *Appellant*.

---

*John Michael Rosellini* and *James Arthur McNally*, for appellant (appointed counsel for appeal).

*H. Steward Menefee, Prosecuting Attorney*, and *Jason S. Richards, Deputy*, for respondent.

SEINFELD, J. — James M. Leupp appeals from a conviction of possession of cocaine with intent to deliver. He challenges the superior court's denial of his motion to suppress evidence. We affirm.

## FACTS

Findings of Fact. We paraphrase the findings of fact that the trial court entered to support the suppression decision, CrR 3.6(b). In the early hours of July 6, 1997, an intoxicated person made a "911 hang-up call" from Leupp's residence. Grays Harbor Deputy Sheriff Keith Peterson responded. At the front door, Peterson spoke with Leupp and two females, Roberta Schumacher and Michelle Frost; everyone in the residence was nervous and uncooperative.

Peterson subjectively believed that someone might have been injured, perhaps assaulted, and that the three occupants were trying to prevent him from discovering that other person. Leupp gave Peterson permission to enter the residence to see if anyone was injured or in need of assistance, and Peterson entered.

One of the women walked to a back room that Leupp later admitted was his. Peterson followed her. Upon entering the room, he immediately saw, in plain view atop a dresser, a white powder residue that resembled cocaine in color and texture. Peterson had the training and experience to enable him to recognize cocaine.

Peterson then noticed a triple beam scale on the floor,

and he knew that such scales are commonly used to weigh illicit drugs. On the scale he could see more white powder residue. And next to the scale Peterson saw brown paper formed into an oval and wrapped with tape, in a manner consistent with that used to package larger amounts of illicit drugs, including cocaine, when such drugs have been shipped by a supplier. The oval shaped package was lying on a grocery bag, but Peterson could not see the bag's contents.

Leupp entered the room and stood between Peterson and the dresser, preventing Peterson from seeing anything else. Leupp then revoked his consent.

Peterson applied for a search warrant on the basis of his observations.

Conclusions of Law. Based upon the above findings, the trial court concluded: (1) Peterson was faced with exigent circumstances—a 911 call by an intoxicated person in the early morning hours and three nervous, uncooperative people at the door—warranting his entry into the residence; (2) Peterson received valid consent to enter and check for an injured person; (3) Peterson had an absolute right to follow the female to the back room in the interests of officer safety; (4) the white powder, scales and packaging were in plain view; (5) those items alone gave Peterson probable cause to believe a crime was being committed inside the residence; (6) any statements Leupp made at the time are admissible because he was not in custody when he made them.

Search Warrant Affidavit. In Peterson's affidavit for a search warrant, he outlined his extensive training and experience in the detection of cocaine and other illicit drugs and his knowledge of the usual behavior and characteristics of drug dealers. He described events at the residence, beginning with his being met at the door by the three "extremely nervous" individuals, who initially avoided answering his questions and then told him that a woman named "Lisa" had fought with Michelle Frost but had left before Peterson arrived. Leupp consented to Peterson's entry to "look

around to ensure that no one was injured due to some type of assault which may have taken place." All three occupants paced the floor and glanced around as if making sure that nothing had been left in view. Schumacher in particular had dilated pupils and seemed to be under the influence of drugs.

Peterson then related how he had followed Frost to the back room, concerned that she might be attempting to conceal someone or retrieve a weapon. He described seeing the white powder, scales and packaging, and how Leupp hastened into the room and stood between him and the dresser, and then asked Peterson to leave the room. Peterson stated that Frost meanwhile had left the residence and that Schumacher explained that Frost had gone to find and fight with "Lisa."

Peterson checked the three occupants for warrants, discovered a warrant for Schumacher, and arrested her. He looked around outside for Frost and "Lisa," but could not find them. Peterson returned to the residence later, after Frost had called 911 again, sounding "under duress." But he found Frost still uncooperative.

Back at the station, Peterson checked further and learned that "Lisa" Downing and Leupp had been stopped for a traffic violation on May 24, 1997, in Leupp's pickup. Downing had been driving on a suspended license. The arresting officer had found nearly $7,000 in cash on Leupp's person and a duffel bag containing 24 baggies of cocaine, of which Leupp and Downing denied any knowledge. Leupp had explained that he intended to use the money to buy cedar.

Finally, Peterson averred that Leupp had several previous convictions for dealing drugs and that the drug task force had periodically received tips, the most recent in early 1997, that Leupp was a major cocaine dealer.

The Search. Based upon Peterson's affidavit, a magistrate issued a warrant on July 8, 1997, authorizing the search of Leupp's residence, person and vehicles, and ordering a return of the warrant within five days. Officers executed the warrant on July 18, 1997, finding: large amounts

of cocaine, drug paraphernalia and packaging materials, and quantities of cash in the residence and on Leupp's person.

Motion to Suppress. The State charged Leupp with possession of cocaine with intent to deliver and Leupp then moved to suppress the evidence. He argued that (a) the warrant was defective for requiring a return of the warrant within five days of its execution, rather than the three days specified by RCW 69.50.509; and (b) the affidavit failed to establish probable cause because: (i) Peterson improperly obtained much of the information in his affidavit: he lacked consent to search, or at least exceeded the scope of consent; and his search for an injured person was merely a pretext to find evidence; (ii) the items observed by Peterson—the white powder, scales and paper oval—were innocuous, and (iii) the court could not properly consider the tips about Leupp's drug activities by unidentified informants or the "tainted" evidence found in the traffic stop on May 24.

The superior court denied Leupp's motion, entered the findings and conclusions paraphrased above, and found Leupp guilty on a stipulated record.

## LEGAL ISSUES AND ANALYSIS

On appeal, Leupp repeats some of the issues in his motion to suppress, but he no longer contends that the items seen by Peterson did not establish probable cause or that the warrant mistakenly required a return within five days. Instead, he raises two new issues on appeal: (1) He argues that the warrant had become stale by the time it was served, 10 days after being issued; and (2) he argues in a supplemental brief that the search was invalid because Peterson failed to inform him that he could refuse consent to enter, as allegedly required by *State v. Ferrier*, 136 Wn.2d 103, 960 P.2d 927 (1998).

The general rule is that issuance of a warrant is a matter of judicial discretion, with the reviewing court according great deference to the magistrate's determination

of probable cause and resolving any doubts in favor of the warrant's validity. *State v. Olson*, 73 Wn. App. 348, 354, 869 P.2d 110 (citing *State v. Kalakosky*, 121 Wn.2d 525, 531, 852 P.2d 1064 (1993)), *review denied*, 124 Wn.2d 1029 (1994).

## I. Emergency Exception to Warrant Requirement

Ordinarily, the police must have a warrant to enter and search a private building. An exception to this rule exists for emergencies. *See, e.g., State v. Muir*, 67 Wn. App. 149, 153-55, 835 P.2d 1049 (1992); *State v. Lynd*, 54 Wn. App. 18, 771 P.2d 770 (1989). As *Muir* explains, the emergency doctrine is related to another exception to the search warrant requirement, i.e., where exigent circumstances are present. Exigent circumstances are present where it may be impractical to obtain a search warrant, as in cases of hot pursuit. *Muir*, 67 Wn. App. at 152, citing cases.

In contrast to the exigent circumstances exception, the emergency doctrine does not involve officers investigating a crime but arises from a police officer's community caretaking responsibility to come to the aid of persons believed to be in danger of death or physical harm. *See State v. Menz*, 75 Wn. App. 351, 353, 880 P.2d 48 (1994), *review denied*, 125 Wn.2d 1021 (1995); *State v. Gocken*, 71 Wn. App. 267, 276, 857 P.2d 1074 (1993), *review denied*, 123 Wn.2d 1024 (1994); *Muir*, 67 Wn. App. at 153-56. For example, in *Lynd*, the police, responding to a "911 hang-up call," had a right to enter a home to seek out a woman who might have made the call and might have been injured by her husband, who was departing the scene with a cut face. 54 Wn. App. at 22-23. *Lynd* explained that for a search to come within the emergency exception,

> we must be satisfied that the claimed emergency was not simply a pretext for conducting an evidentiary search and instead was "actually motivated by a perceived need to render aid or assistance." To that end, the State must show that: (1) the searching officer subjectively believed an emergency existed; and (2) a reasonable person in the same circumstances would have thought an emergency existed.

54 Wn. App. at 21 (citation omitted). There must also be a reasonable basis for associating the need for assistance with the place that is entered. *Gocken*, 71 Wn. App. at 277.

Like the officer in *Lynd*, Peterson was responding to a "911 hang-up call," late at night by someone intoxicated, and he had a right to investigate the circumstances behind that call, without obtaining consent, if he reasonably and subjectively believed that an emergency existed. But we need not resolve this issue if Peterson's entry was consensual, because that is potentially an equally valid basis for entry. We proceed to the consent issue, and find it dispositive.

II. Validity of Consent

■ ■ This case presents the issues of whether Leupp gave valid, voluntary consent and whether Peterson's search exceeded the scope of Leupp's consent. *State v. Hastings*, 119 Wn.2d 229, 234, 830 P.2d 658 (1992). The State has the burden of demonstrating that the consent was voluntary. *State v. Smith*, 115 Wn.2d 775, 789, 801 P.2d 975 (1990). The voluntariness of consent is a question of fact to be determined by considering all the circumstances, including: (1) whether *Miranda* warnings preceded the giving of consent; (2) the degree of education and intelligence of the consenting person; and (3) whether the consenting person was told he could refuse consent. *Smith*, 115 Wn.2d at 789 (citing *State v. Shoemaker*, 85 Wn.2d 207, 212, 533 P.2d 123 (1975)); *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, 10 A.L.R.3D 974 (1966).

■ The trial court found that Leupp "gave Deputy Peterson permission to check the residence to make sure that nobody was injured or in need of assistance, and at that time Deputy Peterson entered the main part of the residence." Leupp assigns error to this finding (among others). Our task, therefore, is to see if substantial evidence supports it, *State v. Hill*, 123 Wn.2d 641, 870 P.2d 313 (1994), and then to determine if the consent was voluntary and if Peterson stayed within the scope of consent.

Peterson testified that he responded to an intoxicated

female's "911 hang-up call" from Leupp's address. Peterson believed that there might have been a domestic assault involving two women, because "the dispatcher had told me that two different females had called, and in my mind it sounded like one person had called 911 and then been cut off, maybe pushed away from the phone, and then a second person picked up the phone and said, 'We don't need any help,' you know, and that's commonly what will happen, especially for someone who doesn't want the police to come to their house."

When Peterson arrived, he made inquiries but none of the three would give him any information. He then "asked if I could come inside and look around and make sure that nobody was . . . bleeding somewhere in the back room, to make sure that they're not—to make sure they're okay." Leupp, whom Peterson knew to be the "possessor" of the residence, replied, "Okay, but there's nobody here."

Peterson went into the living room, stayed there briefly while the occupants paced and glanced around, then started to walk toward the back portion of the house. As he did this, Frost hurried ahead of him "and at that point I was concerned that maybe she was either trying to retrieve a weapon or trying to escape or something to that effect, so I immediately took off after her."

Peterson's testimony adequately supports the finding that Leupp consented. Leupp denied giving Peterson consent to enter, but it was the trial court's prerogative to find Peterson's testimony more credible. *Johnson v. Department of Licensing*, 71 Wn. App. 326, 332, 858 P.2d 1112 (1993).

The evidence also indicates that the consent was voluntary. In *State v. Werth*, 18 Wn. App. 530, 571 P.2d 941 (1977), *review denied*, 90 Wn.2d 1010 (1978), the court found the consent involuntary because of police coercion. There, the police, who were looking for a prison escapee, surrounded a house and ordered the resident to come out and keep her hands visible; one officer had a shotgun; she was effectively under arrest because she was not free to

leave; she was not given *Miranda* warnings or told she could refuse consent; two days earlier the police had barged into her home and searched it without a warrant; she gave consent to enter because there could be little question that they intended to search the house with or without her consent. *Werth*, 18 Wn. App. at 533, 535.

This case differs from *Werth*. There is no indication that Peterson used coercion to obtain consent. There was no reason for Peterson to give Leupp *Miranda* warnings; Leupp was not in custody and not even suspected of a crime. Leupp was 54 years old and had an 11th grade education. More significantly, Leupp was quite familiar with the criminal justice system and presumably with his legal rights, because he had a record of four prior felony convictions, including three drug crimes. The mere fact that the police do not give *Miranda* warnings or tell a resident he can refuse consent does not negate the consent. *See Smith*, 115 Wn.2d at 789 (neither knowledge of the right to refuse consent nor the giving of *Miranda* warnings is essential to a valid consent); *State v. Jordan*, 30 Wn. App. 335, 339, 633 P.2d 890, *review denied*, 96 Wn.2d 1017 (1981).

■ In a supplemental brief, Leupp cites *Ferrier*, 136 Wn.2d 103, to argue that Peterson had a duty to tell him he could refuse consent. In *Ferrier*, the Supreme Court held, for the first time, that in the course of conducting a "knock and talk" procedure, the police violate article I, section 7 of the Washington Constitution if they do not inform a home dweller of her right to refuse consent to a warrantless search. 136 Wn.2d at 115-18. The Supreme Court decided *Ferrier* on August 27, 1998, and hence it was unavailable to Leupp in proceedings below.

Leupp did not cite the Washington Constitution in moving to suppress. But even if he had, Peterson did not go to Leupp's residence to conduct a "knock and talk." That "inherently coercive" situation occurs when police officers come to someone's door without a warrant or other basis for entry, suspecting illegal activity but lacking probable cause to arrest or search, and ask if they can come inside

to look around. *See Ferrier,* 136 Wn.2d at 107, 115; *State v. Graffius,* 74 Wn. App. 23, 24, 871 P.2d 1115 (1994). Instead, Peterson came to Leupp's door responding to a 911 distress call. *See Lynd,* 54 Wn. App. at 22-23. In this situation, Peterson had no duty to inform Leupp of a right to refuse consent.

Viewing the totality of the circumstances the evidence indicates that Leupp's consent was voluntary.

Peterson clearly did not exceed the scope of Leupp's consent. He asked permission to enter to "look around" for someone who might be injured, someone linked to the 911 call. No such person was visible in the living room. Peterson specifically mentioned checking the "back room." Apart from the officer's right to follow Frost in the interests of self-protection in case she was trying to retrieve a weapon, Peterson had a right to pursue the express purpose for obtaining consent, i.e., to check for someone who might be injured. *See State v. Mathe,* 35 Wn. App. 572, 577, 668 P.2d 599 (1983), *aff'd,* 102 Wn.2d 537, 688 P.2d 859 (1984) (consent for police to enter and "look around the house" for robbery suspect allowed entry to bedroom). This issue lacks merit.

III. Anonymous Informant's Tip

Leupp assigns error to the issuing magistrate's reliance on information that unidentified persons provided about his alleged drug activities. But the trial court gave this factor no weight, ruling that probable cause for the warrant was established exclusively by Peterson's observations at Leupp's residence on the morning of July 6, 1997. Thus, we need not consider this issue.

IV. Previous Traffic Stop

Leupp also assigns error to the magistrate's reliance on information gained from the traffic stop on May 24, 1997. Here again, the trial court gave this factor no weight in finding probable cause for the warrant. We need not consider this issue.

## V. Stale Warrant

█ Finally, Leupp raises a common complaint, that the warrant had become stale by the time it was served on July 18, 1997—10 days after being issued. *See, e.g., State v. Huff*, 33 Wn. App. 304, 307, 654 P.2d 1211 (1982); *State v. Higby*, 26 Wn. App. 457, 613 P.2d 1192 (1980). The warrant directed the officers to execute it within 10 days. Leupp's complaint is not that the officer recited stale facts, but that the warrant was not served expeditiously.

Because Leupp raises this issue for the first time on appeal, we need consider it only if it is an issue of manifest constitutional error. RAP 2.5(a). Leupp does not satisfy this standard. The issue implicates a court rule, not manifest constitutional error.

CrR 2.3(c) provides that a warrant "shall command the officer to search, within a specified period of time not to exceed 10 days . . . ." The Supreme Court considered this rule in *State v. Thomas*, 121 Wn.2d 504, 851 P.2d 673 (1993), where the warrant similarly directed the officers to search a residence "within 10 days of this date." The Supreme Court, while noting that "a delay in execution may render a warrant invalid if probable cause no longer exists at the time the warrant is executed," approved the rule's 10-day execution period. *Thomas*, 121 Wn.2d at 513. In light of *Thomas*, the warrant's command to search within 10 days of issuance did not violate CrR 2.3(c), and execution of the warrant on the tenth day was proper. *See State v. Wallway*, 72 Wn. App. 407, 415, 865 P.2d 531 (1994).

Affirmed.

Armstrong, A.C.J., and Morgan, J., concur.

Review denied at 139 Wn.2d 1018 (2000).