[No. 48357-9-I.  Division One.  March 25, 2002.]

THE STATE OF WASHINGTON, *Respondent*, v. VIENGMONE KHOUNVICHAI, *Appellant*.

*Eric J. Nielsen* (of *Nielsen, Broman & Koch, P.L.L.C.*), for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Randi J. Austell, Deputy,* for respondent.

ELLINGTON, J. — Police officers obtained consent to enter a residence for the purpose of talking to Viengmone Khounvichai about a recently reported incident of malicious mischief. We agree with the juvenile court that the requirements of *State v. Ferrier*[1] did not apply to the facts of this case, that the consent to enter was voluntary under the circumstances, and that the police officers did not exceed the scope of that consent. Accordingly, we affirm Khounvichai's juvenile court adjudication for possession of cocaine.

## Facts

Viengmone Khounvichai was charged in juvenile court with one count of possession of cocaine. At the fact-finding hearing, Redmond Police Officer Christine Penwell testified that she investigated a reported incident of malicious mischief on January 30, 2000. The complainant said that a man named McBaine had been at her house shortly before an object came through the window. The complainant then gave Officer Penwell an address for McBaine.

At about 10:00 P.M., accompanied by Officer Bowman, Officer Penwell went to the address provided by the complainant. According to Officer Penwell, McBaine was a "person of interest" and the purpose of the visit was "basically [to conduct] a knock and talk."[2] The officers

---

[1] 136 Wn.2d 103, 960 P.2d 927 (1998).

[2] Report of Proceedings (RP) (July 25, 2000) at 17, 19.

knocked on the door, which was answered by Elizabeth Orr. The officers asked if they could talk to McBaine. Orr replied, "Oh, yes, he's my grandson," and asked if he was in trouble.[3] Officer Penwell told her they just wanted to talk to him and asked if they could come in. At this point, Orr responded, "Oh, yes, of course," opened the door, and stepped back.[4] The officers then entered into the living room.

After the officers entered, Orr immediately walked down the hallway to a rear closed bedroom door. Officer Penwell stood near the man in the living room, while Officer Bowman followed Orr about halfway down the hallway and stopped. Orr knocked on the bedroom door and told the occupants that "there was somebody here to see you."[5] When McBaine opened the door, both officers smelled burning marijuana.

McBaine turned around and said something to the two other occupants of the room, including Khounvichai. Through the open door, both officers saw Khounvichai bolt from view. Believing that Khounvichai might be going for a weapon, Officer Bowman quickly entered the bedroom and saw Khounvichai part way inside a closet. Officer Bowman then ordered Khounvichai to show his hands. When Khounvichai failed to comply, Officer Bowman attempted to grab his hands. During the ensuing struggle, Officer Bowman saw Khounvichai fling a white object, which fell near the open door. Officer Penwell looked down as she entered the room and saw a baggie containing a white substance that was later identified as cocaine. As the officers looked at the baggie on the floor, Khounvichai yelled out, "That ain't my shit."[6]

Khounvichai moved to suppress the cocaine, arguing that Orr's consent to enter the home was invalid under *Ferrier*

[3] RP (July 25, 2000) at 57.

[4] RP (July 25, 2000) at 19.

[5] RP (July 25, 2000) at 24.

[6] RP (July 25, 2000) at 36-37.

because the police had not advised her of the right to refuse their request. He also argued that Orr's consent was not voluntary under the totality of the circumstances and that the officers had exceeded the scope of Orr's consent. The juvenile court denied the motion, concluding that *Ferrier* did not apply because the officers intended only to speak with McBaine, not search the residence. The court also determined that Orr's consent was voluntary and that the officers did not exceed the scope of the consent. The court found Khounvichai guilty as charged at the conclusion of the fact-finding hearing.

## Analysis

Khounvichai contends that Orr's consent to enter was involuntary because the officers did not advise her of the right to refuse consent as required by *Ferrier*. In *Ferrier*, the court addressed the propriety of police "knock and talk"[7] procedures, concluding that the greater privacy protection afforded by article I, section 7 of the Washington Constitution imposed the following requirement:

> [W]hen police officers conduct a knock and talk for the purpose of obtaining consent to search a home, and thereby avoid the necessity of obtaining a warrant, they must, prior to entering the home, inform the person from whom consent is sought that he or she may lawfully refuse to consent to the search and that they can revoke, at any time, the consent that they give, and can limit the scope of the consent to certain areas of the home. The failure to provide these warnings, prior to entering the home, vitiates any consent given thereafter.[8]

Central to the *Ferrier* court's ruling is the inherently coercive nature of a police request to search, particularly when the request is made after officers have entered the

---

[7] "In a 'knock and talk,' the goal of the police is to search for contraband without first obtaining a warrant. They knock on a suspect's door, obtain the resident's permission to enter to discuss a complaint, and subsequently ask permission to search the premises." *State v. Vy Thang*, 145 Wn.2d 630, 635, 41 P.3d 1159 (2002) (citing *Ferrier*, 136 Wn.2d at 107).

[8] *Ferrier*, 136 Wn.2d at 118-19.

home. At the time they asked for permission to search, the four officers in *Ferrier* were armed, were wearing black raid jackets, and had entered the defendant's home and were standing in the small front room. Under such circumstances, a truly voluntary consent to search must be based on knowledge of the right to refuse consent before officers have entered the home.[9]

■ But the Supreme Court has repeatedly rejected any suggestion that *Ferrier* established a bright-line rule requiring a warning every time a police officer requests permission to enter a residence.[10] In *State v. Williams*,[11] for example, a citizen informant told officers that the defendant had an outstanding arrest warrant and could be found at a local apartment. After confirming the accuracy of the information, the officers received permission to enter the apartment to confirm the identities of the occupants. Given the limited purpose for the police entry, the court found that the case did not resemble the type of knock and talk warrantless search that *Ferrier* was intended to prevent:

> We recognize that law enforcement officers need to enter people's homes in order to provide their valuable services for the community on a daily basis. We do not find it prudent or necessary to extend *Ferrier* to require that police advise citizens of their right to refuse entry every time a police officer enters their home. Police officers are oftentimes invited into homes for investigative purposes, including inspection of break-ins, vandalism, and other routine responses. We do not find a constitutional requirement that a police officer read a warning each time the officer enters a home to exercise that investigative duty. To apply the *Ferrier* rule in these situations would unnecessarily hamper a police officer's ability to inves-

---

[9] *Ferrier*, 136 Wn.2d at 118.

[10] *See State v. Bustamante-Davila*, 138 Wn.2d 964, 983 P.2d 590 (1999) (*Ferrier* warnings not required when police officers accompanied Immigration and Naturalization Service agent serving a deportation order); *see also State v. Leupp*, 96 Wn. App. 324, 334, 980 P.2d 765 (1999) (police officer responding to 911 "hang-up" call not required to advise resident of the right to refuse consent before entering to ascertain whether anyone inside was in need of assistance).

[11] 142 Wn.2d 17, 11 P.3d 714 (2000).

tigate complaints and assist the citizenry. *Instead, we limit the requirement of a warning to situations where police seek to conduct a search for contraband or evidence of a crime without obtaining a search warrant.*[12]

Here, as in *Williams*, the officers did not seek to enter the residence to look for contraband or arbitrarily search the house.[13] Rather, it is undisputed that the officers went to the Orr residence to ask McBaine, who was a suspect and "person of interest," if he had information about the reported malicious mischief. The officers did not ask to search the residence, and nothing in the record suggests they had any motive for entering beyond talking to McBaine. Moreover, given the nature of the crime under investigation, there was no reasonable likelihood that physical evidence associated with the alleged malicious mischief would be found in the house, either in plain view or through a search.

■ The officers in this case entered the residence for a limited, routine investigatory purpose. Because their conduct did not constitute the type of coercive knock and talk procedure addressed in *Ferrier*, the officers were not required to advise Orr of her right to refuse consent. Contrary to Khounvichai's suggestion, Officer Penwell's characterization of the procedure as a knock and talk is not controlling. It is the nature of police conduct, not a witness's descriptive label, that determines the applicability of the *Ferrier* rule.

Khounvichai argues that an officer's request to enter a residence to talk to an occupant about an alleged offense is no different than a request to search because "[t]he result of the entry is the same—an open or plain view search without a warrant."[14] For this proposition, Khounvichai relies on the recent decision in *State v. Kennedy*, in which the court determined that "the officers' request for permission to enter is, in effect, a request for permission to 'search' for

---

[12] *Williams*, 142 Wn.2d at 27-28 (emphasis added).

[13] *See State v. Holmes*, 108 Wn. App. 511, 517, 31 P.3d 716 (2001) (*Ferrier* warnings required where police went to defendant's apartment without a warrant, intending to search for contraband).

[14] Appellant's Br. at 15.

anything in plain view."[15] But this statement must be viewed in context.

In *Kennedy*, police officers went to the defendant's motel room to investigate a complaint about a narcotics transaction in progress. After hearing activity inside the room that was consistent with drug activity, the officers knocked at the door. When the defendant opened the door, the officers explained that they were investigating a complaint about the room and asked if they could come in and talk about it. After entering, the officers saw drugs in plain view. Although the officers in *Kennedy* did not ask for permission to search, they were investigating a crime in progress, with the obvious possibility of contraband in plain sight. Under such circumstances, a request to enter is arguably tantamount to a request to search. The facts in *Kennedy* are therefore distinguishable, and we do not read the decision as suggesting that *Ferrier* warnings are required whenever an officer asks for permission to enter a residence to talk to an occupant about a potential criminal matter.

■ ■ Khounvichai next contends that even if *Ferrier* does not apply in this case, the juvenile court erred in finding that Orr's consent to enter was voluntary and that the officers did not exceed the scope of the consent. Whether consent is freely given is a factual determination based on the totality of the circumstances, including whether *Miranda*[16] warnings had been given prior to obtaining consent, the degree of education and intelligence of the consenting person, and whether the consenting person was advised of the right not to consent.[17] No one factor is determinative, and the State bears the burden of establishing the voluntariness of the consent by clear and convincing evidence.[18]

---

[15] 107 Wn. App. 972, 977, 29 P.3d 746 (2001), *review denied*, 145 Wn.2d 1030 (2002).

[16] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[17] *Bustamante-Davila*, 138 Wn.2d at 981-82.

[18] *See State v. Smith*, 115 Wn.2d 775, 789, 801 P.2d 975 (1990).

■ In this case, the officers identified themselves and accurately described the purpose of their visit; they made no show of force or claim of authority to enter.[19] Given the preliminary stage of the investigation, their failure to respond directly to Orr's question about whether McBaine was "in trouble" was neither deceptive nor misleading. Moreover, as the trial court found, Orr was on notice "that there was some concern about McBain[e]."[20] Orr did not hesitate in her responses and immediately gestured for the officers to enter the house after they explained their purpose. Certainly there was no reason to give *Miranda* warnings to Orr. Finally, the officers' testimony clearly established that Orr was of average or greater intelligence.[21] Under these circumstances, the absence of *Miranda* warnings and the failure to advise Orr of the right to refuse do not negate consent.[22] The juvenile court did not err in finding that Orr's consent was voluntary.

■ Finally, Khounvichai contends that Officer Bowman exceeded the scope of consent when he walked down the hallway. We disagree. After inviting the officers inside to talk to McBaine, Orr immediately walked down the hallway to the bedroom door. While Officer Penwell stood near the man in the living room, Officer Bowman walked a short distance down the hallway, where he stopped and waited. Under the circumstances, Officer Bowman's conduct was reasonable and completely consistent with the scope of Orr's consent and the purpose of talking to McBaine.[23]

Affirmed.

AGID, C.J., and GROSSE, J., concur.

Review granted at 147 Wn.2d 1008 (2002).

---

[19] *See Vy Thang*, 145 Wn.2d at 636.

[20] Clerk's Papers at 23.

[21] *See Bustamante-Davila*, 138 Wn.2d at 982.

[22] *See Leupp*, 96 Wn. App. at 333.

[23] *See State v. Cotten*, 75 Wn. App. 669, 679-80, 879 P.2d 971 (1994).