[No. 26270-7-III.    Division Three.    October 14, 2008.]

THE STATE OF WASHINGTON, *Respondent*, v. ALLEN N. OVERHOLT, *Petitioner*.

*Michael V. Hubbard*, for petitioner.

*Colleen G. Fenn, Prosecuting Attorney*, and *Rea Lynn Culwell, Deputy*, for respondent.

¶1 KORSMO, J. — Appellant Allen Overholt was convicted of four counts of second degree unlawful hunting of big game in Columbia County District Court. The charges arose

after a game agent, finding two fresh cow elk gut piles, followed the vehicle tracks to Mr. Overholt's home. He showed the agent the two carcasses hanging in a shed. Concluding that *Ferrier*[1] warnings were not required in this circumstance, we affirm.

¶2 Fish and Wildlife Officer Ryan John, investigating a report of unlawful hunting, found two fresh cow elk gut piles in the Cougar Canyon area of Columbia County. It was not hunting season for cow elk. He found a cigarette with brown stripes and the word BRONCO inscribed on it. There were ATV and trailer tire tracks near the gut piles, and another set of vehicle tire tracks nearby. Officer John followed the tracks 2.5 miles to Mr. Overholt's home on Cougar Canyon Road. The officer parked in the driveway and started walking toward the front of the house. He observed fresh blood spots on the floor of the carport.

¶3 Mr. Overholt approached the officer in the driveway. He was smoking a BRONCO cigarette. The officer explained about the elk guts, the matching BRONCO cigarette he had found in the field, the fact that the tracks went from the field to Mr. Overholt's house, and the fresh blood in the carport. Mr. Overholt's hand began shaking. After a period of quiet, he asked the officer if he was "going to write him a ticket." The officer responded that he first needed to check the two cow elk. Mr. Overholt led the officer to a nearby shed and opened the door. Two cow elk were hanging inside.

¶4 Ten weeks later the four counts of second degree unlawful hunting of big game were filed. In addition to being a closed season, Mr. Overholt did not have a license to hunt elk. He moved to suppress, arguing that the officer needed to give him *Ferrier* warnings before "searching" the shed.

¶5 The trial court found that the officer had probable cause to believe the crime of unlawful big game hunting had occurred and was lawfully on the premise. The court also

---

[1] *State v. Ferrier*, 136 Wn.2d 103, 960 P.2d 927 (1998).

found that the officer was not coercive and that Mr. Overholt voluntarily led the officer to the shed. The court concluded that *Ferrier* warnings were not required and the display of the elk carcasses was voluntary. After the motion was denied, the trial court convicted the defendant on stipulated facts.

¶6 Mr. Overholt appealed to the Columbia County Superior Court. The superior court concluded that the district court had properly found the facts and applied the correct law. Accordingly, it affirmed the convictions. This court subsequently granted review to determine the application of *Ferrier* to this fact pattern.

¶7 In *Ferrier*, officers acting on a tip that marijuana was being grown in a residence, arrived in force to seek a "voluntary" consent to search a woman's house. 136 Wn.2d at 106-107. The officers did not tell the woman that she had the ability to refuse consent. *Id.* at 106, 108, 115. After being invited into the home, the officers asked for consent to search the residence. *Id.* at 107. A detective explained that this "knock and talk" procedure was used in order to avoid seeking a search warrant. *Id.* The Washington Supreme Court reversed the conviction, ruling that because the woman had a heightened right of privacy in her home under article I, § 7 of our constitution, officers could not enter a home to seek voluntary consent to search the dwelling without first informing her, *inter alia*, that she did not need to consent. *Id.* at 106, 118-119. The court's analysis repeatedly emphasized the heightened protection given the home under our constitution. *Id.* at 106, 110, 113-116, 118.

¶8 Our appellate courts since have considered the application of *Ferrier* to varying fact patterns. The Washington Supreme Court has several times considered whether *Ferrier* governed in cases where officers went to residences for different purposes than gaining entry with intent to obtain consent to search in lieu of obtaining a warrant. In each instance, the court has found that the different purpose in going to the residence took the case outside of the need for *Ferrier* warnings. *See State v. Khounvichai*, 149

Wn.2d 557, 69 P.3d 862 (2003) (*Ferrier* warnings not required where police request entry to a home merely to question or gain information regarding an investigation); *State v. Williams*, 142 Wn.2d 17, 28, 11 P.3d 714 (2000) (*Ferrier* warnings not required where police request consent to enter a home to arrest a visitor under a valid warrant); *State v. Bustamante-Davila*, 138 Wn.2d 964, 983 P.2d 590 (1999) (*Ferrier* warnings not required when police and Immigration and Naturalization Service agent gained consensual entry to defendant's home to serve a presumptively valid deportation order). The Court of Appeals likewise has addressed and resolved *Ferrier* issues by focusing on the purpose for which the officers entered a residence. *E.g., State v. Dodson*, 110 Wn. App. 112, 124, 39 P.3d 324 (*Ferrier* not applicable to officers looking on rural property for other man suspected in vehicle theft), *review denied*, 147 Wn.2d 1004 (2002); *State v. Johnson*, 104 Wn. App. 489, 505-506, 17 P.3d 3 (2001) (*Ferrier* warnings not necessary when officers went to house with probable cause to arrest suspect); *State v. Leupp*, 96 Wn. App. 324, 333-334, 980 P.2d 765 (1999) (*Ferrier* warnings not applicable when police officers arrived at a residence in response to a 911 call), *review denied*, 139 Wn.2d 1018 (2000).

¶9 On other occasions, the courts have considered the application of *Ferrier* to locations other than a residence[2] and concluded that *Ferrier* warnings are not required other than in the situation of the heightened scrutiny applied to the home. *E.g., State v. Tagas*, 121 Wn. App. 872, 90 P.3d 1088 (2004) (*Ferrier* warnings do not apply to search of purse).

¶10 We do not decide whether the shed on the property is entitled to the same protections the *Ferrier* court emphasized belong to the home. Instead, as in the other cases where the Washington Supreme Court has not found *Ferrier* applicable, we focus here on the intent of the

---

[2] This court treated a motel room as the equivalent of a house for *Ferrier* purposes in *State v. Kennedy*, 107 Wn. App. 972, 29 P.3d 746 (2001), *review denied*, 145 Wn.2d 1030 (2002).

officer. He was in fresh pursuit of criminal activity, investigating an offense within his authority. He did not enter the property with the intent of obtaining consent to search in order to evade a search warrant. Unlike *Ferrier*, the officer did not even enter into the home or any other building on the property prior to seeking consent to search. Indeed, the officer never even asked for consent to search the property—he simply expressed his interest in seeing the cow elk. This was a far cry from the *Ferrier* situation.

¶11 There simply was no deception about the officer's intention. He followed the trail to the house and asked to see the cow elk. The *Ferrier* court's concern about police entering the property before expressing their true purpose—obtaining consent to search—is not at issue here. Of the Washington Supreme Court cases considering *Ferrier*, this case is most like *Khounvichai*. There, officers went to a home and explained that they had come in order to question an occupant about possible involvement in a crime. 149 Wn.2d at 559. They were permitted entry and eventually spoke to their suspect; in the course of doing so they saw evidence of another crime that implicated another person in the house. *Id.* at 559-560. Our court declined to extend the *Ferrier* warning requirement to this situation, emphasizing that *Ferrier* was intended to protect *houses* against *searches*, not serve as a threshold requirement for all police/suspect meetings. *Id.* at 563-564. Similarly here, Officer Ryan candidly told Mr. Overholt why he was there and why he suspected Mr. Overholt's involvement in the offense. There was no attempt to mislead Mr. Overholt about what was going on.

¶12 The facts of this case are far different from *Ferrier* and there was no need to convey the consent warnings of that case in the midst of investigating the game offenses.

Accordingly, the trial court correctly denied the motion to suppress.[3] The convictions are affirmed.

SWEENEY and BROWN, JJ., concur.

Review denied at 165 Wn.2d 1047 (2009).

[3] In light of the substantial evidence obtained before the carcasses were seized, including the defendant's act of displaying them, it is not likely that suppressing that evidence would have altered the outcome of the case. The evidence observed in plain view by the officer while on the property is not the product of a search and would be admissible even if the carcasses had been suppressed. *See Khounvichai,* 149 Wn.2d at 564-566.