IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 77415-8-I |
| Respondent, | ) ) | |
| | ) | ORDER DENYING MOTION |
| v. | ) | FOR RECONSIDERATION, |
| | ) | WITHDRAWING OPINION, |
| JUSTIN MICHAEL WILLIAMS, | ) | AND SUBSTITUTING OPINION |
| Appellant. | ) ) | |

Appellant, Justin Williams, has filed a motion for reconsideration of the opinion filed in the above matter on July 8, 2019. Respondent, State of Washington, has not filed a response to appellant's motion. The court has determined that appellant's motion for reconsideration should be denied, the opinion should be withdrawn, and a substitute opinion be filed amending lines 3 thru 7 on page 10 of the opinion. Now, therefore, it is hereby

ORDERED that appellant's motion for reconsideration is denied. It is further

ORDERED that the opinion filed on July 8, 2019, is withdrawn and a substitute opinion be filed.

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 77415-8-I |
| Respondent, | ) ) ) | DIVISION ONE |
| v. | ) ) | |
| JUSTIN MICHAEL WILLIAMS, | ) | UNPUBLISHED OPINION |
| Appellant. | ) ) | FILED: August 12, 2019 |

SMITH, J. — Justin Williams appeals his convictions for first degree assault and first degree unlawful possession of a firearm for shooting Sunrah Starling. Although the government committed misconduct by failing to disclose gun evidence to the defense until after voir dire had begun, the trial court did not abuse its discretion in denying Williams's CrR 8.3(b) motion to dismiss. Dismissal is an extreme remedy, the misconduct was not dishonest in nature, and the misconduct did not prejudice Williams because he would have remained incarcerated on a Department of Corrections (DOC) hold for violating his release conditions on an unrelated conviction. Furthermore, because the trial had already commenced, the trial court's two-month recess to allow the gun to be tested and accommodate attorney conflicts did not violate CrR 3.3's speedy trial rules. Williams's constitutional right to a speedy trial also was not violated under the totality of the circumstances. Additionally, neither spectator nor juror misconduct deprived Williams of a fair trial because all the jurors agreed

individually to uphold their oaths and try the case based on only the evidence admitted and the trial court's instructions. Finally, Williams's claims of ineffective assistance of counsel in his statement of additional grounds (SAG) do not warrant reversal. We affirm.

## FACTS

On July 4, 2016, Starling, his fiancé, and their four children visited a duplex where his mother and sister lived in Federal Way. While Starling was setting off fireworks, some men confronted him and asked what he was doing there. When the situation escalated, Starling retreated to his sister's house and the men followed him inside the front door and began punching him. Starling's sister and her boyfriend forced the men out, but the men returned to the back door and tried to kick it in. When someone in the residence yelled for the men to stop because there were children inside, they finally left. Starling walked outside with his son to check on his mother in the other unit of the duplex. He heard his fiancé yell his name and his son say, "'Daddy, Daddy.'" Williams then walked up to Starling and shot him several times.

After Starling went to the hospital, his fiancé did some research on Facebook and examined the pages of two of the individuals from the encounter, whom she recognized from school. She found a YouTube video with Williams in it and shared the video with Detective Richard Kim. Detective Kim took a still photograph from the video and sent out a bulletin to other law enforcement agencies to identify Williams. Williams's community custody officer responded.

Police arrested Williams on July 7, 2016. During a search of his car and apartment, police found several holsters, an extended magazine, ammunition, and body armor, all of which violated conditions of his release from an earlier unrelated conviction. Based on these violations, the DOC placed a hold on Williams, revoking his community custody on the prior conviction pending the outcome of the investigations into his release condition violations and Starling's shooting. The State then charged Williams with first degree assault and first degree unlawful possession of a firearm based on the shooting of Starling.

Trial began on April 5, 2017. After several days of voir dire, the prosecutor disclosed that several months earlier, the gun used in the shooting was recovered in another crime and was currently at the crime lab awaiting testing. The prosecutor admitted that she knew about the gun evidence in January 2017 though she carelessly failed to disclose its existence to defense counsel. Defense counsel moved to suppress the evidence or dismiss the case, but the trial court denied both motions. The court then recessed for two months to allow the crime lab a few weeks to finish testing the gun and to accommodate the attorneys' other scheduling conflicts.

Trial resumed on June 13, 2017, before a new judge and jury. During Starling's testimony, the court observed Williams's wife and sister-in-law taking pictures and instructed them not to do so. Two days later, the bailiff reported that a juror was concerned about the photography. The court then questioned each juror about what they witnessed or discussed with other jurors and whether they could abide by their oaths to consider only evidence admitted at trial and to follow

3

the court's instructions. Although all jurors said they could, the court later dismissed juror 8. The trial court also denied Williams's motion for a mistrial, which was based on spectator and juror misconduct.

The jury convicted Williams as charged. The trial court sentenced Williams to 300 months of confinement. Williams appeals.

## MOTION TO DISMISS

Williams argues that the trial court abused its discretion by denying his motion to dismiss the charges against him under CrR 8.3(b). We disagree.

CrR 8.3(b) authorizes dismissal "due to arbitrary action or governmental misconduct when there has been prejudice to the rights of the accused which materially affect the accused's right to a fair trial." To obtain dismissal, a defendant must show (1) arbitrary action or governmental misconduct and (2) prejudice affecting his right to a fair trial. State v. Puapuaga, 164 Wn.2d 515, 520, 192 P.3d 360 (2008). For the first element, government misconduct need not be evil or dishonest in nature; simple mismanagement is enough. State v. Michielli, 132 Wn.2d 229, 239, 937 P.2d 587 (1997). For the second element, prejudice to the defendant can result from a violation of either the right to a speedy trial or the "'right to be represented by counsel who has had sufficient opportunity to adequately prepare a material part of his defense.'" Michielli, 132 Wn.2d at 240 (quoting State v. Price, 94 Wn.2d 810, 814, 620 P.2d 994 (1980)). Nevertheless, "[d]ismissal for discovery violations is an extraordinary remedy available only when the alleged misconduct has materially affected the

4

defendant's right to a fair trial." State v. Brooks, 149 Wn. App. 373, 389, 203 P.3d 397 (2009).

"A trial court's decision to dismiss charges is reviewable under the manifest abuse of discretion standard." Puapuaga, 164 Wn.2d at 520-21. A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds. Michielli, 132 Wn.2d at 240.

Here, during voir dire on April 10, 2017, the prosecutor told the court that she discovered there was a gun at the crime lab that might be a match for the casings found at the crime scene. According to the prosecutor, the gun was recovered in January 2017 from a shooting in Tacoma and there was a preliminary ballistics match to the casings collected from this crime scene. But the gun had not yet been tested by the crime lab to determine whether it was a match to the gun used by Williams.

The day after the prosecutor's disclosure, defense counsel moved to suppress the gun evidence or, in the alternative, to dismiss the case due to the State's misconduct. Defense counsel explained that Detective Kim notified the prosecutor on January 3, 2017, that there was a preliminary ballistics match. No one notified defense counsel that there was a potential match. Then, on February 3, 2017, defense counsel interviewed Detective Kim while the prosecutor was present. Defense counsel asked Detective Kim whether he had performed any other duties, tests, or investigation in the case since December 2016. Detective Kim indicated that he had only sent an e-mail about a warrant

5

and return services; neither the prosecutor nor Detective Kim mentioned the gun or the potential ballistics match.

The prosecutor confirmed defense counsel's timeline and explained that the gun was not yet tested because Detective Kim failed to notify the crime lab of Williams's trial date when he requested testing. The prosecutor explained that she had "completely forgotten" about the ballistics match until she reviewed the final evidence list over the weekend and that she was "mortified at [her] oversight on this." She asked the court to find that her omission was not ill intentioned or malicious and that suppression or dismissal of the evidence was not necessary.

The trial court determined that dismissal of the case was an extreme remedy that was not warranted under these circumstances:

> This clearly is an unfortunate situation which ideally we could have avoided in the first place.
> And based on what has been described to me, I certainly can't find that it is the consequence of intentional misconduct. It is perhaps negligence on the part of the State. You know, we all have busy schedules. There's a lot going on and that's unfortunate. I wish it were otherwise. But it isn't. And so given that the best I can find is negligence under these circumstances, I don't think dismissal of the case is warranted. It is certainly the most extreme remedy and required only under extraordinary circumstances.

Williams argues that the trial court abused its discretion in denying his motion to dismiss because it failed to recognize that mismanagement alone constitutes misconduct. In fact, mismanagement alone is sufficient to warrant dismissal under CrR 8.3. See, e.g., State v. Sherman, 59 Wn. App. 763, 768-69, 801 P.2d 274 (1990) (dismissal not an abuse of discretion where the State failed to produce records promised to the defendant even though the State attempted in good faith to obtain the records, which were not in its control). But the State's

6

tardy disclosure of evidence in this case does not require reversal because Williams fails to show that the mismanagement prejudiced him. During the two-month recess, Williams could not have been released from custody because he remained on the DOC hold and the delay was not so long that any of the eye witnesses' testimony was materially compromised. Additionally, the recess allowed defense counsel time to adequately prepare for his defense based on the new gun evidence. For these reasons, Williams's right to a fair trial was not prejudiced.

Williams argues that he was prejudiced by the mismanagement because he was forced to choose between having prepared counsel and proceeding with the trial in a timely fashion. But, as explained above, Williams remained in custody on the DOC hold and defense counsel was prepared to address the gun evidence at trial given the recess. Therefore, the trial court did not abuse its discretion by declining to dismiss the case under CrR 8.3(b).

Williams cites two cases where the trial court granted the defendant's CrR 8.3(b) motion to dismiss and argues those cases require reversal here. But the trial court's decision to grant the motions to dismiss in those cases does not make the trial court's decision not to dismiss in this case an abuse of discretion. Although dismissal was an option, nothing in the rules required the trial court to dismiss Williams's case. And, given the circumstances, denying the motion to dismiss was not manifestly unreasonable here.

In the alternative, Williams argues that the trial court should have suppressed the gun evidence. But he assigns no error, cites no case authority,

and presents no argument directly challenging the trial court's denial of his motion to suppress. Therefore, we do not consider this argument. State v. Olson, 126 Wn.2d 315, 321, 893 P.2d 629 (1995) (appellate court will not consider issues for which no assignment of error is made and no argument or legal citation is presented).

Finally, Williams argues that his continued custody on a DOC hold cannot support a conclusion that he was not prejudiced because such a conclusion implies that defendants in "custody have no right to have new charges against them resolved in a timely fashion." He is mistaken. Defendants in custody have a right to have charges against them resolved in a timely fashion. But a court does not abuse its discretion by considering a defendant's custody status and the prejudice that the defendant might suffer by a delay in trial when weighing whether a remedy other than dismissal is warranted. Therefore, this argument is not persuasive.

## CRR 3.3 AND SPEEDY TRIAL RIGHTS

Williams argues that the trial court's decision to recess for two months violated both CrR 3.3 and his constitutional right to a speedy trial. We disagree.

### CrR 3.3

First, Williams argues that the recess violated CrR 3.3. But because CrR 3.3 only applies before a trial commences, we disagree.

CrR 3.3(b)(1)(i) requires a defendant who is detained be brought to trial within 60 days after the date of arraignment. CrR 3.3 is a procedural right that is

designed to protect, but not guarantee, the constitutional speedy trial right. <u>State v. Andrews</u>, 66 Wn. App. 804, 809-10, 832 P.2d 1373 (1992).

"As a general matter, commencement of a trial satisfies the purpose of a rule to secure a speedy trial." <u>Andrews</u>, 66 Wn. App. at 810. "[N]othing more need be done to comply with CrR 3.3 than that the case be called and the court entertain a preliminary motion." <u>Andrews</u>, 66 Wn. App. at 810. But if the State takes "advantage of the rule to justify an undue delay of the remainder of the trial," there could be a violation of CrR 3.3. <u>Andrews</u>, 66 Wn. App. at 811. "We review an alleged violation of the speedy trial rule de novo." <u>State v. Kenyon</u>, 167 Wn.2d 130, 135, 216 P.3d 1024 (2009).

Here, the trial expiration date was May 5, 2017. The trial commenced on April 5, 2017, when the trial court heard pretrial motions. For this reason, the State did not violate CrR 3.3.

Williams argues that the two-month recess that began on April 11, 2017, effectively subverted the protections of CrR 3.3 because it allowed the trial court to disregard the strict rules on granting continuances that CrR 3.3 mandates. He claims that the State deliberately mismanaged the evidence to delay his trial. But nothing in the record indicates that the State was aware of the need for a recess on April 5 and deliberately engaged in pretrial proceedings to subvert CrR 3.3. Therefore, this argument is not persuasive.

Williams next argues that the trial court had no grounds to delay the trial for two months. But the legal authority he cites for this proposition addresses the standards of CrR 3.3, which, as discussed above, apply before trial commences.

9

In contrast, the decision to grant or deny a recess during trial is generally left to the discretion of the trial court. State v. Mays, 65 Wn.2d 58, 62, 395 P.2d 758 (1964). Because Williams does not specifically argue that the trial court abused its discretion by granting the recess, he has waived any such argument. State v. Thomas, 150 Wn.2d 821, 868-69, 83 P.3d 970 (2004) ("[T]his court will not review issues for which inadequate argument has been briefed or only passing treatment has been made.").

### Constitutional Right to a Speedy Trial

Williams argues that the two-month recess violated his right to a speedy trial under both the state and federal constitutions. We disagree.

The speedy trial rights provided by the Sixth Amendment to the Federal Constitution and article I, section 22 of the Washington Constitution are equivalent. State v. Iniguez, 167 Wn.2d 273, 290, 217 P.3d 768 (2009). We review the denial of constitutional rights de novo. Iniguez, 167 Wn.2d at 280.

In Barker v. Wingo, 407 U.S. 514, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972), the United States Supreme Court adopted a balancing test that compared the conduct of both the State and the defendant to determine whether a court denied a defendant's speedy trial rights. Barker, 407 U.S. at 530; Iniguez, 167 Wn.2d at 283. But before we apply that test, the "defendant must show that the length of the delay crossed a line from ordinary to presumptively prejudicial." Iniguez, 167 Wn.2d at 283. This analysis is highly dependent on the facts of the case and should consider the complexity of the case, the length of the delay, and the reliance on eyewitness testimony. Iniguez, 167 Wn.2d at 283, 292. "[O]nce the

defendant demonstrates a delay is presumptively prejudicial, that showing triggers the remainder of the Barker inquiry, which then examines the nature of the delay to determine if a constitutional violation occurred." Iniguez, 167 Wn.2d at 283. The factors to be considered include the length of the delay, the reason for the delay, the extent to which the defendant asserted his speedy trial right, and the prejudice to the defendant because of the delay. Iniguez, 167 Wn.2d at 283-84. These factors are not exclusive, and none are required for a delay to be a constitutional violation. Iniguez, 167 Wn.2d at 283.

Here, Williams was incarcerated on July 7, 2016, and his trial did not resume until June 13, 2017, almost a year later. Because Williams was charged with serious crimes, some delay is expected. But he was incarcerated for almost a year and the State's case relied on the testimony of eyewitnesses whose memories could fade with the passage of time or who could become unavailable because of the delay. Therefore, the delay was presumptively prejudicial and a Barker analysis is required.

The first Barker factor requires us to consider the length of delay: specifically, how far past the presumptively prejudicial amount of time the delay proceeded. Iniguez, 167 Wn.2d at 293. "[T]he longer the pretrial delay, the closer a court should scrutinize the circumstances surrounding the delay." Iniguez, 167 Wn.2d at 293. While the delay in this case was presumptively prejudicial, it was not necessarily an "undue delay" because Williams was brought to trial within a year of his arrest. Iniguez, 167 Wn.2d at 293.

"The second factor in the inquiry is the reason for delay." Iniguez, 167 Wn.2d at 294. We look "to each party's level of responsibility for the delay and assign different weights to the reasons for delay." Iniguez, 167 Wn.2d at 294. Here, the reason for the delay was the State's mismanagement of its evidence.

The third factor considers whether Williams asserted his speedy trial rights. Iniguez, 167 Wn.2d at 294. Although Williams states that he asserted his speedy trial rights below, the record does not support that argument. Williams claims that he demanded that trial proceed by arguing that the gun evidence should be suppressed. But defense counsel's suppression argument did not mention speedy trial rights. And although defense counsel told the court that she and Williams disagreed as to whether the trial should go forward or recess, Williams did not make a pro se declaration of his speedy trial rights.

Finally, the fourth factor considers what prejudice the defendant suffered because of the delay. Iniguez, 167 Wn.2d at 295. "Prejudice is judged by looking at the effect on the interests protected by the right to a speedy trial: (1) to prevent harsh pretrial incarceration, (2) to minimize the defendant's anxiety and worry, and (3) to limit impairment to the defense." Iniguez, 167 Wn.2d at 295. "[N]o showing of actual impairment is required to demonstrate a constitutional speedy trial violation." Iniguez, 167 Wn.2d at 295. Williams asserts that prejudice was present due to the weakening of witnesses' memories. He also asserts that he was prejudiced by the prolonged incarceration because he was left in limbo until the trial concluded. But because he remained in custody on a DOC hold, any prejudice to him from the delay was minimal.

12

Balancing each of the above factors, the delay under the totality of the circumstances here was not a speedy trial violation of constitutional magnitude that justifies the extreme remedy of dismissal of the charges with prejudice. Iniguez, 167 Wn.2d at 295. Although there was a two-month delay due to the State's misconduct, there was not an undue delay, Williams did not unequivocally assert his speedy trial rights, and the prejudice he suffered was minimal because he remained incarcerated on a DOC hold. Therefore, there is no constitutional speedy trial violation.

## SPECTATOR AND JUROR MISCONDUCT

Williams argues that the trial court erred in denying his motion for a mistrial based on spectator and juror misconduct. We disagree.

A mistrial is necessary only where the defendant was so prejudiced that a new trial is the only way to ensure that he will be treated fairly. State v. Bourgeois, 133 Wn.2d 389, 406, 945 P.2d 1120 (1997). "A trial court's denial of a motion for mistrial will be overturned only when there is a 'substantial likelihood' that the error prompting the request for a mistrial affected the jury's verdict." State v. Rodriguez, 146 Wn.2d 260, 269-70, 45 P.3d 541 (2002) (internal quotation marks omitted) (quoting State v. Russell, 125 Wn.2d 24, 85, 882 P.2d 747 (1994)).

We review the trial court's denial of a mistrial for an abuse of discretion. Rodriguez, 146 Wn.2d at 269. A trial court abuses its discretion if no reasonable judge would have reached the same conclusion. Rodriguez, 146 Wn.2d at 269.

13

## Spectator Misconduct

Williams argues that the conduct of his wife and sister-in-law violated his right to a fair trial and the trial court abused its discretion in denying his motion for a mistrial. We disagree.

In determining whether spectator misconduct caused sufficient prejudice to warrant a new trial, we consider "(1) its seriousness, (2) whether it involved cumulative evidence, and (3) whether the trial court properly instructed the jury to disregard it." Bourgeois, 133 Wn.2d at 409.

In Bourgeois, after the final verdict, a juror complained that during trial, a spectator was glaring or staring and made a hand gesture of pointing a gun at a witness. Bourgeois, 133 Wn.2d at 408. Applying the test above, the court concluded that the spectator misconduct did not warrant a new trial because there was no evidence the defendant directed the threats, most of the jurors did not see the conduct, and the jury was instructed to consider only the testimony of witnesses and admitted exhibits. Bourgeois, 133 Wn.2d at 408-09.

Here, on the second day of trial, a Tuesday, the trial court witnessed a cell phone flash coming from either Williams's wife or Williams's sister-in-law in the gallery. He asked the two women if they were taking photographs in court and both denied doing so, although Williams's wife admitted that she took a photograph of her husband earlier. The trial court explained that photography is only allowed under certain circumstances and that it would not allow photographs taken to "intimidate our witness." The trial court instructed the women not to take any more photographs or recordings without its prior permission.

14

On Thursday, the trial court told the parties that the bailiff had disclosed that some of the jurors were concerned with a spectator's use of a cell phone camera in the courtroom. The bailiff explained that on Tuesday, an unidentified juror asked her if she saw that people were taking pictures in the courtroom. The bailiff stated, "'I did not, but the judge has already addressed that issue,' and [they] left it at that." Then on Wednesday, the jury asked her why the trial court had not dealt with the photography issue. Juror 8 explained to the bailiff, "'The older dark-skinned woman in the gallery panned us with her video, with her phone, in the jury box, and we do not—we are concerned and we do not want her having pictures of our faces.'" The bailiff told the jury that she would address their concerns with the court.

The trial court decided to first question juror 8 about the photographs. Before any questioning occurred, the parties agreed that the trial court should ask what the juror saw in the courtroom, if the jurors discussed the photography amongst themselves, and if the juror could still abide by his oath to fairly try the case according the evidence and the trial court's instructions. Upon questioning, juror 8 explained that on Tuesday, he saw someone holding a smartphone out in front of herself and that he discussed the cell phone use with "multiple people." He also agreed that he could still "abide by [his] oath to fairly try the issues in this case according to the evidence and the instructions" from the court and that he would not discuss this issue with the other jurors. But after he left the courtroom, juror 8 complained to the bailiff that he and some other jurors "'were discussing why [Williams's] wife can be here and our family members cannot. We can't

discuss the case with our family members, but his wife can be here.'" He also said that the bailiff did not give the jury a clear answer when someone brought up the photography on Tuesday, that several people brought it up to the bailiff, and that the jury wanted to know why Williams's wife could take photographs. The bailiff informed the trial court of this conversation and the trial court expressed dismay that juror 8 did not raise those concerns in open court.

Based on juror 8's responses, the trial court decided to question the other jurors. Defense counsel suggested that the trial court ask a "more open-ended question" about the jurors' discussions of the photography, such as if they could "comment on the discussion that's taken place about the cameras in the courtroom among the jurors."

Of the 13 jurors, only 3 reported seeing any photography in the courtroom, but 11 said the photography was discussed to some extent by the jury. When asked "how extensive" the jury's discussion about the photography was, juror 1 indicated that "[m]aybe twice" they discussed "[j]ust that it was disturbing that the jury was being recorded." When asked if the jurors had been discussing the photography, juror 3 said that on Tuesday, two jurors asked if anyone saw that "somebody in the audience was recording everybody" and the next day the jury discussed whether "the Court did anything." Juror 4 explained that one or two jurors "talked about it a little bit" but that it was not "a huge conversation" and described that "a woman in the audience . . . had her cell phone out . . . [and] was recording during one of the testimonies." Juror 6 stated that three jurors asked "out loud . . . are people allowed to do that." Juror 7 said there was "one

16

mention" on Tuesday when someone asked, "did anyone see someone over there recording" and then one mention another morning. Juror 9 said that in the hallway on Tuesday, one juror brought the photography to the bailiff's attention and juror 9 responded, "'You saw that, too? I noticed that." Juror 10 said that on Tuesday, jurors "were concerned that somebody had a camera up and/or the phone up and the video—it looked like they were videotaping and had spanned to the jury" and later the jurors stated that "the phone hasn't been up since then." Juror 11 said that on Tuesday, one juror told the bailiff that he had seen the photography and was concerned about it and in one other conversation, a juror said "he didn't think that was allowed or should be allowed or was wondering whether that was allowed and that he was concerned about that." Juror 12 explained that on Tuesday, "[a] couple of us were asking if the other had seen [the photography] and we were questioning whether that was legal, whether it's okay to do that or not" and then earlier in the morning a juror "said that he had brought it to the bailiff's attention." Finally, juror 13 said that "a good majority of us" discussed "that a young lady was recording on her cell phone, so they were very nervous about that. Whatever she was recording had all of our faces on it." Jurors 2 and 14 did not see the photography or hear any juror discussions about the photography. All the jurors agreed that they could abide by their oath to fairly try the case according to the evidence and the court's instructions.

Defense counsel moved for a mistrial. The trial court denied the motion but did excuse juror 8 from further service based on his comments to the bailiff after the trial court questioned him. Additionally, the trial court instructed the jury

and the gallery that "both parties have requested that there be no cell phones in the courtroom and, accordingly, at the request of the parties, I am excluding phones, cell phones, smartphones from the courtroom of any kind other than those used by the lawyers or by their associates." The trial court also reminded the jury that "until you are in the jury room for deliberations in this case, you must not discuss the case with other juror [sic] or with anyone else" and that "the only evidence you are to consider in this case consists of the testimony of witnesses and exhibits admitted into evidence."

Based on these circumstances, the trial court did not abuse its discretion in denying Williams's motion for a mistrial under the Bourgeois factors. Here, the misconduct at issue was undoubtedly serious. Indeed, the prosecutor argued that jail phone calls and social media posts indicated that Williams's wife was photographing witnesses in an apparent attempt to intimidate those witnesses, like the witness intimidation that occurred in Bourgeois. And the misconduct did not involve cumulative evidence before the jury. But, also similar to Bourgeois, the trial court properly instructed the jury to try the case according to the evidence and the court's instructions. Although the trial court did not give the jury an instruction to disregard the photography, it did verbally instruct the jury to consider only evidence admitted by the court. The written jury instructions also stated that:

> The evidence that you are to consider during your deliberations consists of the testimony that you have heard from witnesses, stipulations and the exhibits that I have admitted during the trial. If evidence was not admitted or was stricken from the record, then you are not to consider it in reaching your verdict.

18

"A jury is presumed to follow instructions given." State v. Brown, 132 Wn.2d 529, 618, 940 P.2d 546 (1997). And the trial court, who saw what happened in the courtroom and observed the jurors during the questioning, was in the best position to judge the credibility of the jurors when they indicated they would abide by their oaths. State v. Elmore, 155 Wn.2d 758, 769 n.3, 123 P.3d 72 (2005) ("The trial court is simply in the best position to evaluate the jurors' candor."). Therefore, we presume that the jurors followed the trial court's instructions and considered only evidence admitted during the trial. Williams has not shown that he was sufficiently prejudiced to warrant a new trial.

Williams argues that this case is distinguishable from Bourgeois because the misconduct here was much more serious in that it was directed not at a witness, but toward the jurors. But even if it were Williams's wife's intent to intimidate the jury by photographing them, each juror promised to fairly try the case according to the evidence and the court's instructions. Although some jurors expressed being "nervous" or "concerned" by the photography, none of the jurors stated that they were intimidated or that the photography affected their ability to abide by their oaths to try the case fairly.

Williams contends that the issue of race warrants additional consideration because Williams and most of the members of the gallery were black whereas the jury was all white, except for one Asian woman. While racism and implicit bias are critical issues that the court system must be aware of and address proactively, reversal is not required in this case. Again, each of the jurors agreed

they would consider only evidence admitted during the trial. Therefore, we can presume that the jurors did not consider the spectator misconduct.

Williams next argues that the trial court had the opportunity to instruct the jury not to consider the misconduct and failed to do so. But defense counsel requested no such instruction, and Williams cites no authority for the proposition that the trial court had an obligation to give such a limiting instruction sua sponte. See, e.g., State v. Russell, 171 Wn.2d 118, 124, 249 P.3d 604 (2011) (holding that when counsel fails to request a limiting instruction for admitted ER 404(b) evidence, the trial court is not required to sua sponte give a limiting instruction). Nevertheless, it is unlikely that such an instruction was necessary given that the trial court confirmed with the jurors individually that they would continue to abide by their oaths to fairly try the case according to the evidence and the court's instructions. Therefore, the lack of a specific instruction to disregard the spectator misconduct was not necessary.

Williams also argues that given juror 8's conduct, the jury's discussions, and the short, affirmative answers given by jurors to the trial court's leading question about whether they could still abide by their oaths, we cannot presume that the jury followed the trial court's instructions. He cites State v. Fire, 145 Wn.2d 152, 34 P.3d 1218 (2001). But in that case, a juror called the defendant a "baby raper" during voir dire, and when asked by the prosecutor whether he could still keep an open mind, he responded that he would "be leaning to the accusation is there." Fire, 145 Wn.2d at 155. The prosecutor then attempted to rehabilitate the juror, who simply answered "yes" to the prosecutor's leading

20

questions about whether he could follow the law and instructions. Fire, 145 Wn.2d at 156. Fire is not persuasive here because, unlike the juror in that case, there was no indication from any of the jurors in this case that they could not act impartially or follow the trial court's instructions. While we agree with Williams's suggestion that an open-ended question would better address the jurors' abilities to abide by their oaths and alleviate any concerns raised by leading questions, defense counsel never requested such a question. Therefore, this argument is waived on appeal.

Williams next contends that where a jury is the subject of attempted intimidation, no instruction could ensure the defendant a fair trial. But he cites no authority to support this argument. Therefore, we do not consider it. See State v. Ferrier, 136 Wn.2d 103, 110, 960 P.2d 927 (1998) (appellate courts not obliged to consider arguments unsupported by citation to legal authority).

Finally, Williams argues that the instructions given by the trial court prejudiced him because they "emphasized the serious nature of the spectator misconduct, ensuring that jurors would remain incapable of setting it aside." But he did not object to the instruction when it was proposed by the trial court or when it was given. Therefore, Williams waived this argument. State v. Schaler, 169 Wn.2d 274, 302-03, 236 P.3d 858 (2010) (a party who fails to object to jury instructions in the trial court waives a claim of error on appeal).

21

Juror Misconduct

Williams argues that the jurors' discussions about the spectator misconduct constituted juror misconduct and that the trial court abused its discretion in denying his motion for a mistrial. We disagree.

"The right of trial by jury means a trial by an unbiased and unprejudiced jury, free of disqualifying jury misconduct." State v. Tigano, 63 Wn. App. 336, 341, 818 P.2d 1369 (1991). "'The injection of information by a juror to fellow jurors, which is outside the recorded evidence of the trial . . . constitutes juror misconduct.'" Bourgeois, 133 Wn.2d at 410 (alteration in original) (quoting Richards v. Overlake Hosp. Med. Ctr., 59 Wn. App. 266, 270, 796 P.2d 737 (1990)). "Once juror misconduct is established, prejudice is presumed" and "the State must satisfy the trial court that, viewed objectively, it is unreasonable to believe the misconduct could have affected the verdict." State v. Boling, 131 Wn. App. 329, 333, 127 P.3d 740 (2006).

Williams argues that the jurors' discussions about the spectator photography constituted misconduct because the jury was considering evidence outside of the record. But it is unreasonable to believe that these discussions affected the verdict. According to the jurors, the conversations about whether someone took photographs during trial and if that was allowed in the courtroom were limited in both frequency and duration. It is unreasonable to believe that these brief discussions affected the jury's verdict, especially where the trial court confirmed with each juror that he or she would consider only evidence admitted

22

at trial in coming to a verdict. Therefore, Williams was not so prejudiced by the alleged misconduct that only a new trial can ensure he receives a fair trial.

The State argues that Williams has forfeited any arguments for reversal that are based on his wife's misconduct because he collaborated with her to intimidate witnesses, which resulted in her misconduct in the courtroom. This argument is based on theories such as forfeiture by wrongdoing and invited error. But the State cites no cases directly analogous to the situation here: where a defendant was unable to contest spectator or juror misconduct because his associates were perceived as intimidating witnesses or jurors in the courtroom. In the absence of any findings that Williams directed his wife and sister-in-law to intimidate the jurors or the witnesses, we do not consider this as a basis for affirming.

## INEFFECTIVE ASSISTANCE OF COUNSEL

In a SAG, Williams argues that his trial counsel was ineffective. We disagree.

To prevail on a claim of ineffective assistance of counsel, a defendant must show that his counsel's performance fell below an objective standard of reasonableness and that the deficient performance prejudiced him. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). "'When counsel's conduct can be characterized as legitimate trial strategy or tactics, performance is not deficient.'" In re Pers. Restraint of Caldellis, 187 Wn.2d 127, 141, 385 P.3d 135 (2016) (quoting State v. Kyllo, 166 Wn.2d 856, 863, 215 P.3d 177 (2009)).

23

To establish prejudice, a defendant must show that there is a reasonable probability that the result of the trial would have been different absent the challenged conduct. Strickland, 466 U.S. at 694.

First, Williams argues that defense counsel was ineffective because she failed to "strenuously object" to the State's use of the gun evidence or further investigate the State's misconduct. But because defense counsel moved to suppress the gun evidence and moved for dismissal related to the State's misconduct, her performance was not deficient. Additionally, Williams's argument that defense counsel should have further investigated the State's misconduct relies on e-mail evidence that is outside the record and can only be raised in a personal restraint petition. McFarland, 127 Wn.2d at 335, 338 n.5.

Second, Williams argues that defense counsel was ineffective because she did not test the gun for DNA or contest the admissibility of the gun. He attached a letter to his SAG in which defense counsel states that she obtained Williams's consent not to do further testing on the gun. Again, this letter is not part of the record on appeal. Therefore, Williams must raise this claim in a personal restraint petition. McFarland, 127 Wn.2d at 335, 338 n.5.

Third, Williams argues that defense counsel inadequately raised the CrR 3.3 speedy trial issue because she failed to follow the process designated in CrR 3.3(d)(3). Because trial had already commenced, CrR 3.3 is not applicable and defense counsel was not deficient in not following that rule's procedures for objecting.

Fourth, Williams argues that defense counsel was ineffective because she failed to adequately challenge the lack of racial minorities in the second jury and the dismissal of juror 32, a juror of color, under Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). Batson holds that a prosecutor violates a defendant's right to equal protection by exercising a peremptory challenge based on race. Batson, 476 U.S. at 89. But the record indicates that counsel did object to the lack of diversity on the panel and did challenge the dismissal of juror 32. The trial court denied defense counsel's challenge and found that the strike was not pretextual because the prosecutor provided a race-neutral reason for using a preemptory challenge on juror 32. Because counsel did object and the trial court's ruling was based on Batson, Williams has not shown that defense counsel was ineffective.

Finally, Williams argues that defense counsel was ineffective because she did not object to the prosecutor's improper statements during closing argument. Williams first asserts that the prosecutor misstated the law by informing the jury that a defendant commits second degree assault, not by firing a gun, but simply by pointing a gun at a person if that person reasonably fears that he or she is about to be assaulted. This was not a misstatement of the law. As the trial court instructed the jury, "[a]n assault is also an act done with the intent to create in another apprehension and fear of bodily injury, and which in fact creates in another a reasonable apprehension and imminent fear of bodily injury even though the actor did not actually intend to inflict bodily injury." Therefore, defense counsel was not deficient in failing to object to this argument.

25

Additionally, Williams argues that defense counsel was ineffective in failing to object to the prosecutor's statement that Williams "nearly executed" Starling. "The decision of when or whether to object is a classic example of trial tactics." State v. Madison, 53 Wn. App. 754, 763, 770 P.2d 662 (1989). While the term "executed" could inflame the jury's passion, defense counsel may have decided not to object to avoid drawing attention to the potentially inflammatory phrase. This is a legitimate trial strategy, and defense counsel was not deficient.

We affirm.

WE CONCUR: